(No. 72709.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GRAYLAND JOHNSON, Appellant.

*Opinion filed April 21, 1994.—Rehearing denied May 27, 1994.*

Daniel M. Kirwan, Deputy Defender, and E. Joyce Randolph, Assistant Defender, of the Office of the State Appellate Defender, of Mt. Vernon, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Gael McCaughey-O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant, Grayland Johnson, was arrested for the murder of Douglas Coleman, who was shot to death in Chicago on Easter Sunday, 1988. A jury sitting in the circuit court of Cook County found defendant guilty of first degree murder and also found him eligible for the death penalty. Defendant elected to have the trial court

determine his sentence based on the evidence in aggravation and mitigation. The trial court found no mitigating factors sufficient to preclude imposition of the death penalty under the Criminal Code of 1961 (Criminal Code), section 9—1(b)(3) (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3)), and entered sentence accordingly. The death sentence was stayed pending direct review by this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a)).

In this appeal, defendant raises a number of issues challenging all phases of the proceedings. We affirm the conviction but vacate the death penalty in accordance with the decision of *Morgan v. Illinois* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222, and remand for a new sentencing hearing.

## BACKGROUND

### Pretrial Proceedings

Defendant filed a motion to suppress his confession, contending that his inculpatory statement resulted from the infliction of physical and mental coercion and therefore was the fruit of an illegal arrest. The following evidence was adduced during the hearing on the motion to suppress.

Sergeant James Eldridge testified that he interviewed Arba Holden on April 16, 1988. Holden identified defendant from a photo array. Holden told the officer that he and other men, including defendant, had been together on the date Coleman was killed, April 3, 1988. According to Holden, the men left Ford City in two vehicles, defendant and Sumlin in one car and Holden and the others in a van. The men planned to "do some drug deals" in Chicago and then meet at 59th Street and the Dan Ryan Expressway. Sumlin and defendant were late returning to the meeting place. Sumlin said they were late because defendant had killed a man. Defendant said he had killed the man because the man

owed him $600. The group then got back into their vehicles and entered the expressway. Holden told Sergeant Eldridge that he saw defendant throw a gun into the Little Calumet River.

Detectives Craig Cegielski and his partner, Nick Crescenzo, testified that on April 17, 1988, they went to defendant's home in Ford Heights to question him about the Coleman murder. Before going to defendant's house, the officers had learned from Coleman's family that defendant had been with Coleman the day of the murder. Officers Cegielski and Crescenzo also had been informed of Arba Holden's identification of defendant as a participant in the murder of Coleman. However, at the time the officers went to defendant's house, they did not know whether Holden or anyone else had witnessed defendant shoot the victim.

Defendant agreed to accompany the officers to the police station, saying that he would be glad to help because the victim was his friend, and that he had come to the station on his own accord at a prior time to discuss the slaying. At the station, he was given the *Miranda* warnings, which he waived. Cegielski and Crescenzo took him into an interview room, where they spoke with defendant for 15 or 20 minutes. The officers then left the room to interview others who were at the station, including codefendant Jerome Sumlin. Sumlin implicated both himself and defendant in the murder.

After obtaining Sumlin's inculpatory statements, the officers returned to the room in which defendant was waiting and advised him that he was under arrest. This occurred at approximately noon. Cegielski handcuffed him to the wall and left the room with Crescenzo. The officers testified that no one abused defendant in their presence. Approximately 10 or 15 minutes after the officers left him, defendant called out that he wanted to speak to the State's Attorney.

Assistant State's Attorney Charles Burns arrived and advised defendant of the *Miranda* warnings. Burns spoke to defendant for 45 minutes and brought him lunch. According to Burns, no one threatened defendant or exercised force or coercion while Burns was present.

Carolyn Mabry testified for defendant at the suppression hearing. She stated that defendant had called her on April 18, 1988. He told her he had been arrested and beaten by officers at the station.

Nona Cameron, a correctional officer, testified that defendant told her on April 18 that he had a headache, was dizzy, and had been beaten by the police. At defendant's request she called for paramedics, but she did not observe any injuries herself.

Defendant testified that he went to the police station "freely and voluntarily." He said the paramedics treated him for a venereal disease. He described the officers' abuse of him and told the court he was suing the officers in Federal court.

The court found defendant's allegations of abuse unfounded. The court also ruled that the detectives had possessed sufficient information to take defendant into custody and therefore denied the motion to quash the arrest due to lack of probable cause. The court declined to make a finding as to the exact time that defendant was placed under arrest.

Before trial, defense counsel made a motion *in limine* to preclude the State from introducing evidence of gang membership. The court denied the motion. Next, defense counsel requested that the court ask the potential jurors if they believed that they must automatically impose the death penalty if the State requested it. The court sustained the State's objection to the proposed question.

### The Trial

Lucille McNeal, Coleman's girlfriend, testified that

she last saw Coleman on April 3, 1988, between 9 and 9:30 at night, when he, defendant, and a woman came to her house. Coleman and defendant were friends. McNeal testified that Coleman had belonged to the Black Gangster Disciples but she did not know whether defendant was also a member. McNeal further testified that Coleman had used drugs and that she had been a regular user of cocaine at the time of Coleman's death.

Defendant told McNeal he needed her to go with them to help rob his nephew of money and drugs. She refused, saying that she did not want to go because Coleman would "jump on her." Defendant showed her a small handgun and promised that Coleman would not hurt her, because if he did, defendant would kill Coleman. McNeal tried to talk Coleman out of going with the others on April 3.

Bertha Jackson, who was Jerome Sumlin's girlfriend and the mother of his two children, testified that both Sumlin and defendant belonged to the Black Gangster Disciples. In the afternoon of April 3, 1988, Jackson and Sumlin were present at a house in Chicago Heights, with defendant and others. Defendant took two guns from that house. He joined Jackson and Sumlin in Jackson's car and the three returned to Chicago. In Chicago they tried, unsuccessfully, to buy some drugs. Then they went to Coleman's house to see if he could assist them. Before they got to Coleman's house, defendant gave Sumlin one of the guns he had retrieved from the house in Chicago Heights.

According to Jackson, Coleman agreed to help them locate drugs and entered Jackson's car with her, Sumlin, and defendant. They stopped at McNeal's house. Later, defendant, Sumlin, Jackson, and Coleman drove to a gangway. When the car stopped, Jackson remained in the car while the others got out and walked a short distance. Defendant tried to persuade Coleman to

accompany him down the gangway, but Coleman refused. As they were returning to the car, defendant shot Coleman in the head. Jackson further testified that Sumlin also shot the victim. Defendant shot Coleman "some more" and the three of them left the victim lying on the ground.

Jackson admitted that she was afraid that she would be charged with a crime when the police came to her house a few days later with Sumlin. Jackson went to the station, where she and Sumlin were separated for several hours. Jackson identified defendant as the shooter.

A medical examiner testified that Coleman had sustained 15 gunshot wounds and died as a result of them. The wounds to the victim's face showed a "tatooing" effect, indicating that the bullets had been fired at close range. The firearms examiner testified that the bullets recovered from the victim had come from both .22- and .32-caliber guns. No weapons were recovered.

The trial testimony of investigating detective Craig Cegielski essentially paralleled the testimony he gave at the suppression hearing. Cegielski testified that at the time the officers brought defendant to the police station defendant was not under arrest and he told the officers he wanted to help with the investigation because the victim was his friend. The police put defendant in an interview room while they spoke with Sumlin, who was also at the station. The officers then took Sumlin with them to the home of Bertha Jackson, who accompanied the officers and Sumlin back to the police station. After the officers obtained additional information from Jackson and Sumlin, who implicated defendant in Coleman's murder, the officers placed defendant under arrest. The police left defendant in a room, and after a few minutes, defendant called out that he wanted to talk. Defendant waived his *Miranda* rights and told the

officers that Sumlin had approached defendant on Easter Sunday, April 3, 1988, at a meeting of the Black Gangster Disciples in Ford Heights. Sumlin told defendant he needed help in luring Coleman out of Coleman's house for a "hit," and since defendant was Coleman's friend, defendant would be the best person to approach Coleman. The killing was ordered because Coleman had been "sticking up" the drug houses of some of the gang members. Sumlin had a .22-caliber handgun and gave defendant a .32-caliber handgun when he agreed to help the others get Coleman.

Defendant told the officers that when he and Sumlin got Coleman to the gangway the victim appeared to become suspicious and, as they walked back to the car, Sumlin shot Coleman in the head and told defendant to do so as well. Defendant "emptied" his gun into the victim and Sumlin shot Coleman again.

Toni Ervin testified for the defense. She said that defendant and she were like siblings and had seen each other almost daily. Ervin and her boyfriend, Ronald Holden, saw defendant at approximately 9 or 9:30 in the evening of April 3, 1988, in the parking lot near Shannon's Lounge in East Chicago Heights. Defendant loaned Holden $250. Ervin persuaded defendant to leave his car in the lot and return to her home with them. Defendant stayed at her house, talking with her, until approximately one in the morning. Holden also testified that he had seen defendant at Shannon's parking lot on the night of the shooting, but under cross-examination he admitted that he did not tell anyone about this until one week before trial.

An attorney, Thomas Bennett, testified that defendant had contacted him in 1988 and told Bennett he was in police custody. Bennett asked what defendant had been charged with and defendant said that he did not know. Bennett then spoke to an officer, who told

him that the police were holding defendant for an "investigation" only. Bennett advised defendant not to speak with the police.

Defendant, aged 36 at the time of trial, testified in his own behalf. His parents died in 1973, at which time he was in the military service. He admitted that in 1974 he had pleaded guilty to charges of murder and armed robbery, for which he served $13^1/2$ years in prison. The State also introduced evidence that defendant had been convicted of a different armed robbery and was given a sentence to run concurrently with the sentences he received in 1974 when he pleaded guilty to the murder and armed robbery.

Defendant denied that he had shot Coleman, whom he had met in prison. Defendant was released from prison in July of 1987 and did not see Coleman again until October 1987. He visited Coleman several times at his house and knew that Coleman, a drug addict, was robbing drug houses to support his habit. On April 3, 1988, defendant saw Coleman earlier in the day but left him at about 7 p.m. Defendant's car broke down and he drove a "loaner" to Shannon's. He eventually went to his friend Toni Ervin's house.

Defendant testified that on April 8, 1988, he was questioned at the police station and allowed to leave. Defendant said that on April 17, the police arrested him at his home. Defendant testified that he secretly ingested about a gram each of cocaine and heroin after the police arrived. The police took him to the station, where he refused to answer questions without an attorney present. He said he repeatedly denied murdering Coleman. According to defendant, he was then taken into a washroom and hung outside a window by his handcuffed hands. The police hauled him back in and dipped his head into a toilet. Back in the interview room a plastic bag was put over his head and tightened, and

he was hit on the side of the head. The blows gave him a painful headache.

Defendant further testified that after additional mistreatment he was brought a statement and told to sign it. He did not read it but signed it because he wanted the beatings to stop. He denied that the inculpatory information in the statement was true.

Defendant was taken to the Cook County Hospital emergency room, he testified, where he was seen by a doctor whose name he did not know. Defendant told the doctor he had been beaten by the police and the doctor said that defendant appeared to have "some type of trauma and a post concussion." Defendant also said he had been having problems with his penis. He was given Tylenol for his pain and scheduled for X rays.

Defendant testified that he was returned to the police station and booked on the charges. Two days later he went back to the hospital, where he saw an ophthalmologist who diagnosed him as suffering from decreased vision.

After defense counsel had concluded defendant's direct examination, the State moved to introduce a certified copy of defendant's 1974 conviction for armed robbery, an offense and conviction unrelated to the one he had testified to on direct examination. He had pleaded guilty to the second armed robbery simultaneously with the first and had received a concurrent sentence. The trial court allowed the evidence in over defense objection.

The State elicited defendant's admission that he had been a Disciples gang member before he went to prison, but he denied that he had remained part of the gang after 1982. Defendant also admitted that despite his claims of physical abuse by the police he had no bumps, bruises, or swelling during any of the first four days he was in the Cook County jail.

An orderly at Cermak Hospital testified that he had seen defendant on April 18, 1988, as a "follow-up," concerning his medication for a venereal disease and for no other reason. A doctor who examined defendant at Cermak on April 21, 1988, also testified. She saw no signs of injury during the examination, but determined he had decreased vision in his left eye. She arranged to have defendant examined by an ophthalmologist at Cook County Hospital. Defendant complained to her that he had been beaten.

In rebuttal, the State called a Cook County detention aide who testified that he saw defendant on April 17, 1988, the date of his arrest. Defendant did not complain to the aide about any physical problem except his venereal disease and never said that the police beat him. A police officer who transported defendant to the hospital after defendant had been processed on the criminal charges testified that defendant was treated for gonorrhea and never said he had been beaten. A photograph of defendant taken at the time defendant gave his confession showed no signs of injury.

Detective Nick Crescenzo testified that when he and his partner picked up defendant on April 17, they watched him dress but did not see him ingest any drugs. Crescenzo denied striking defendant and hanging him out of a window. He reiterated that defendant voluntarily accompanied the officers to the station on April 17.

By stipulation, defendant's prior criminal convictions were read into the record. In addition to the 1974 murder and armed robbery convictions, defendant was charged in 1988 with possession of a controlled substance with intent to deliver, unlawful use of a firearm by a felon and armed violence. He was found guilty on all three counts.

THE DEATH PENALTY ELIGIBILITY HEARING

The State sought the death penalty on the basis that

defendant had murdered two individuals: Coleman and the victim of the murder and armed robbery for which defendant was convicted in 1974. Defendant elected to have the jury determine his eligibility for the death penalty. At the first phase of the death penalty hearing, the State introduced proof of his age and the 1974 murder conviction. The State urged the jury to find defendant eligible, arguing that the prosecution was "confident the only fair verdict form that you will sign, and again your verdict on eligibility must be unanimous, must be unanimous you find him eligible or unanimous you find him ineligible. That means all 12 must agree on the verdict."

Defense counsel objected, arguing that the prosecutor's statement of the law was inaccurate. The court sustained the objection, telling the jury that it should read the instructions and follow the law. The prosecutor interjected that a reading of the verdict forms and instructions made it clear "that it has to be a unanimous decision, that all 12 of you people must sign either verdict." In closing argument, defense counsel stated to the jury that they would be given a verdict form to sign and "if one person really would like to save this man's life, that's all it needs. One person. You don't all have to say yes we will save his life." The State objected to this comment; the judge simply advised the jury again that the correct law would be stated in the jury instructions.

The court instructed the jury on the eligibility issues, stating, in part, "If you cannot unanimously decide that the defendant is eligible for the death sentence under the law, there will be no second part of the death penalty hearing. The court will impose a sentence other than death." The jury found defendant eligible for the death penalty.

HEARING IN AGGRAVATION AND MITIGATION

Defendant waived his right to have the jury deter-

mine whether he should be sentenced to death based on the matters in aggravation and mitigation. At the hearing on the second phase of sentencing, the State introduced testimony of defendant's criminal record. A Chicago Heights police officer testified regarding defendant's 1974 convictions for the armed robbery and murder of a liquor store operator. According to the officer's testimony, defendant and three other men came into the store and robbed the victim. The three others left but defendant stayed behind and shot twice into the back of the apparently unconscious victim.

The supervisor of records at Joliet Correctional Center testified that during the years defendant spent in prison for the armed robbery and murder, 1974 through 1987, defendant amassed 104 disciplinary tickets. In the view of the supervisor of records, 32 of these disciplinary write-ups were "serious." The most recent incident report was January 1985, when defendant was cited for having unauthorized property, a cap and a jacket, in his cell. Another witness testified regarding defendant's juvenile record, starting with auto theft in 1968 and 1969. Defendant was charged with criminal trespass in 1971, for which he received probation. Later that year he received a six-month sentence for aggravated battery.

A Chicago police officer testified that in 1988, when defendant was arrested for armed violence, possession of a weapon, and unlawful use of a weapon by a felon, defendant was wearing a necklace with a six-pointed star, which the officer said he recognized as a symbol of the Disciples' gang.

In mitigation, defendant's former girlfriend testified. She said that defendant had always maintained an interest in their child, who was born in 1972, even though she had married another man when the child was four months old and defendant was in the Army. She had never known defendant to be violent.

A woman who taught reading and math in the prison from September 1988 through September 1989 testified that defendant was a cooperative student who was eager to learn and who was willing to help other students.

A third witness testified that she had seen defendant often after his release from prison in 1987 and that he treated her and her children well. She never heard him talk about committing crimes or killing anyone.

David Randall, a mitigation specialist who is a doctoral candidate in psychology, testified regarding his investigation into defendant's family life and upbringing. Randall related that defendant was born in Chicago Heights to middle-aged parents who already had adult children when defendant was born, and they paid little attention to him. His father was a laborer who drank frequently when he was not working. His mother rarely left the house and spent her time cooking and watching television. The home was in poor condition with a dirt floor, no running water, and an outhouse. Defendant essentially was left to raise himself and was only disciplined for behavior that embarrassed his parents, such as wetting his pants.

Defendant eventually drifted, while a teenager, to the home of Antoinette Johnson and her children. Although she was not a relative, Johnson tried to be a good role model. Randall described her as the neighborhood surrogate mother for wayward adolescents. They would come to her to be fed and to get positive support. She met defendant when he was 14 or 15 and saw him regularly. Johnson had not met defendant's parents, but she heard the other children tease defendant about his father, whom they described as an illiterate old man who lived in a shack. Defendant was always respectful but was shabbily dressed and ignorant about basic

things like how to turn on the shower and washing machine. Antoinette said the mothers of the other children would call her home to see if their children were there, but defendant's parents never called about him.

Defendant's parents died in 1973. He had two brothers, one near his own age and one about 20 years older (Jimmie Jr.). His sister, Lucille Drake, was 19 years older. Drake told Randall that she and her mother had beaten defendant often but it had done "no good." Randall described Drake as an angry, self-centered woman who supported herself as a baby-sitter. She lamented to Randall that she could not "whoop" the children anymore "like they deserved" because the Department of Children and Family Services had investigated her and she had to behave herself.

Jimmie Jr. died in 1977, when defendant was in prison. Defendant became very depressed at that time and was admitted to the prison psychiatric unit for about a month. Antoinette spoke highly of Jimmie Jr., but said that the only reason his sister, Lucille Drake, was not in a home for the mentally ill was because there was no one to commit her.

Randall met eight times with defendant, and recalled his most recent interview with him. Defendant told Randall that he had just learned of the death of Antoinette Johnson's son, Whitney. Defendant also stated that his daughter had come to the prison to see him. He seemed emotionally affected by both of these incidents.

Randall also interviewed defendant's aunt, Marcella Johnson. She had known defendant since birth and she echoed what Antoinette Johnson said about defendant's home life. A cousin also testified that members of defendant's extended family were not close and that contact among them was infrequent.

Sandra Young told Randall that defendant had dated her daughter and had gotten along well with Young, her daughter, and her grandchildren.

According to Randall's investigation, defendant first got drunk at age 11, and over the years had abused cannabis and cocaine as well. It was Randall's understanding that when defendant went AWOL from the Army it was because he had overstayed his leave when his mother was ill and subsequently died; his father died several months later. The murder for which defendant was convicted in 1974 occurred shortly thereafter. Defendant told Randall that while he was in the penitentiary, he had asked to be transferred from place to place because he was trying to quit the gangs and he felt "pressured." In fact, he had been stabbed as part of the ritual for getting out of the gang. While in prison, he received graphic arts training with MacIntosh computers and earned his GED. Defendant told the court that to him, the six-pointed star was a symbol of the Muslim religious faith, with each point representing a prophet. He again denied that he had any part of the death of Douglas Coleman.

The trial court enumerated statutory factors in aggravation of sentencing and concluded that defendant was a "repeat assassin" and that a sentence of death was necessary to protect society or prison guards in the future. Subsequent post-trial matters were heard and denied on the same day, including defendant's *pro se* motion based on ineffective assistance of counsel.

## ANALYSIS

### I

*Motion to Quash Arrest and Suppress Evidence*

Defendant first argues that his confession should have been suppressed because it was obtained following an illegal arrest. He argues that he was arrested on the basis of Arba Holden's uncorroborated tip and, therefore, the officers lacked probable cause to take him into custody.

Defendant's argument depends on a finding that he

was placed under arrest when the officers arrived at his home, at 7:15 in the morning of April 17, 1988, or shortly thereafter, when he was taken to the police station for questioning. At that point, defendant argues, the officers were acting solely on the information given to them by an individual, Arba Holden. Holden was one of the men who had planned to buy drugs in Chicago on the day Coleman was murdered. At the time the police took defendant to the station for questioning, they knew of Holden's claim that he had been present when defendant spoke of killing a man. Holden had also told the police that he had seen defendant throw a gun into the Little Calumet River. According to defendant, this information was insufficient cause for his arrest.

In contrast, the State argues that defendant was not placed under arrest until approximately noon on April 17, 1988, after the police had obtained additional information from defendant's accomplice, Jerome Sumlin, and Sumlin's girlfriend, Bertha Jackson. These individuals were present at the shooting and identified defendant as a participant.

The essential elements of an arrest are the intent of the police to make the arrest and the defendant's understanding, based on an objective standard of reasonableness, that he is in fact under arrest. (*E.g.,* *People v. Redd* (1990), 135 Ill. 2d 252, 284.) In *Redd*, this court upheld the validity of an arrest where the evidence was conflicting and the trial court found that defendant had voluntarily accompanied officers to the station to be interviewed in connection with a crime; while defendant was at the station, police obtained information from other witnesses implicating the defendant as the perpetrator. The defendant was then arrested at the police station. *Redd*, 135 Ill. 2d at 290.

In the instant case, we find *Redd* supportive of the trial court's ruling that defendant's arrest was valid.

Defendant admitted at the suppression hearing that he agreed to go with the police officers to the station on April 17 for questioning. He testified that he was not handcuffed when he left his home to go to the police station. Although he testified that he was handcuffed at the station and subsequently beaten, the trial court found defendant's evidence concerning the beating not credible and defendant does not appeal from that ruling of the court. Instead, defendant focuses on the timing of his arrest and the sufficiency of the probable cause determination.

On that issue, the record establishes these facts: (1) at the time defendant was taken from his home to the station, the police officers knew, from Coleman's family, that defendant had been with the victim on the day of the shooting; and (2) the officers had been apprised of Arba Holden's statements about defendant's suspicious comments and acts on the day of the shooting. Although defendant contends that this information alone did not constitute probable cause for his arrest, we need not decide that issue. The record supports a finding that defendant was not placed under arrest until *after* the officers had interviewed Sumlin and Jackson and obtained their eyewitness statements implicating defendant in Coleman's death. Before that time, defendant had not been restrained, fingerprinted, or photographed. He was only being questioned, along with other individuals thought to have knowledge of the shooting. It is true that the trial judge did not make a finding as to the precise time of defendant's arrest; however, the transcript of the hearing reveals that the judge ruled on the motion to quash arrest after reviewing the evidence and referring to his notes, which indicated that the officers had interviewed the two witnesses to the shooting (Sumlin and Jackson), at approximately noon on April 17, 1988. The trial court denied defendant's motion, finding

that the officers had probable cause to arrest defendant. We conclude that the trial court did not err in denying defendant's motion to quash arrest and suppress defendant's statements.

## II

### *Asserted Trial Errors*

As grounds for a new trial, defendant argues that the trial court should have excluded the State's evidence that defendant belonged to a gang and that the murder was gang-related. In support, he cites cases which hold that evidence of a defendant's gang membership is irrelevant, and therefore inadmissible, unless there is an adequate connection between the gang affiliation and the crime charged. (See, *e.g., People v. Smith* (1990), 141 Ill. 2d 40, 56 (State's references to defendant's gang membership, offered to show motive for murder, caused reversible error); *People v. Easley* (1992), 148 Ill. 2d 281, 330 (reference to gang membership held to be error, but not reversible error under the facts).) Defendant acknowledges the State's theory that the motive for the murder in the case at bar was connected to defendant's membership in the gang. However, defendant argues that there was no evidence that the gang *as an organized body* ordered the killing of Coleman to enforce discipline. Consequently, defendant contends that it was reversible error for the State, in presenting evidence of motive, to elicit references to the "gang," instead of references to "group of affected individuals."

We disagree. While defendant's suggested phraseology is indeed a euphemism for the "Black Gangster Disciples," the issue is whether the reference to defendant's gang affiliation constitutes reversible error in the factual context of this case. Evidence of gang membership, like other evidence, is admissible if relevant to an issue in dispute, and its probative value is not substantially outweighed by its prejudicial impact. (*E.g., People*

*v. Gonzalez* (1991), 142 Ill. 2d 481, 487-90 (evidence of the defendant's gang affiliation was admissible because it corroborated the victim's identification of his attacker, a contested issue at trial, and the trial court balanced its probative value against the prejudicial effect).) Conversely, if reference to gang affiliation assists the State's case by only a tenuous inference, it is not sufficiently probative to justify its admission and should be excluded. *Smith*, 141 Ill. 2d at 56; *Easley*, 148 Ill. 2d at 327-30 (evidence did not establish that defendant knew of gang plot to kill prison guard and there were numerous individuals in seven different prison gangs who had similar motive and possible opportunity).

In the instant case, the State's evidence showed that defendant and Sumlin belonged to a gang and met with other gang members to discuss how to lure Coleman out of his home to be murdered. The motive for the homicide was Coleman's reputed robbery of drug houses owned by gang members. Defendant was present at the meeting and, by his own admission, was selected to approach Coleman because of his friendship with the victim. The trial court's ruling on the admissibility of the references to the gang in this case was not erroneous because defendant's affiliation with the gang was directly connected to his selection by the gang members to act as their avenger. We conclude that the court did not abuse its discretion in admitting the evidence.

### III

Defendant also claims that he was denied a fair trial because the State was allowed to present, at the close of its case, a certified copy of defendant's 1974 armed robbery conviction. Defendant argues that the evidence should have been excluded under the rule in *People v. Montgomery* (1971), 47 Ill. 2d 510, which generally bars the use of prior convictions to impeach a witness' credibility if the convictions are not related to veracity

or are more than 10 years old. We note that the 1974 armed robbery conviction in issue is separate from the armed robbery and murder of the liquor store employee to which defendant pleaded guilty.

The State contends that defendant's challenge to the introduction of this evidence was waived because he did not raise the issue in his post-trial motion.

Defendant requests this court to consider the issue under the plain error doctrine. In *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77, this court stated:

> "[W]e have generally held that the failure to object to the admission of evidence operates as a waiver of the right to consider the question on appeal. [Citation.]
>
> We recognize, however, that the waiver doctrine is not absolute. [Citation.] Our Rule 615(a) embodies the exception to the waiver rule. It provides, in part:
>
>> 'Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.' 73 Ill. 2d R. 615(a).
>
> A significant purpose of the plain error exception to the waiver doctrine is to correct any serious injustices which have been done to the defendant. It therefore becomes relevant to examine the strength or weakness of the evidence against him; if the evidence is close, there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved. Thus, this court has held that where the evidence is closely balanced, a court of review may consider errors that have not been properly preserved for review. [Citations.]
>
> In addition to the protection of the defendant in cases where the evidence is closely balanced, the plain error rule also encompasses those errors of such magnitude that the commission thereof denies the accused a fair and impartial trial. [Citation.]"

We do not find the application of the plain error doctrine to be appropriate in this context. The evidence was not closely balanced and the asserted error does not appear to be of such magnitude as to deny defendant a

fair trial. In light of the other criminal offenses that defendant admitted having committed, including murder and another armed robbery, the certified copy of the 1974 armed robbery conviction was not likely to have unduly influenced the jury. Accordingly, without expressing an opinion on the application of the *Montgomery* issue to the case at bar, we hold that review of that issue has been waived.

## IV

Defendant argues that he was never accorded a hearing on the *pro se* motion he filed, months before trial, requesting a substitution of judges "for cause." We note that this motion was not brought to the court's attention until the hearing on the *post-trial* motions. Nonetheless, defendant argues that his conviction and sentence must be vacated as being void because he was denied the right to a hearing, before a different judge, on his motion for substitution of judges. (See Ill. Rev. Stat. 1989, ch. 38, par. 114—5(d).) In response, the State argues that defendant's motion was untimely and groundless.

The following facts are pertinent to the analysis of this issue. Defendant's handwritten motion for substitution of judges is dated July 20, 1990, and appears to be largely based on matters involving defendant's ongoing dissatisfaction with his appointed lawyers from the public defender's office. Attached as an exhibit to the motion was a copy of defendant's previously filed "Motion For Appointment of Counsel Other Than Public Defender." In October 1989, when defendant presented his motion for appointment of private counsel, the court appointed a different attorney from the public defender's office to take over defendant's legal representation. When this second attorney requested a continuance of trial so that she could prepare a motion to reconsider the court's ruling on the motions to quash arrest and

suppress evidence the court told her "not to invest [her] time in that." Thereafter, defendant filed his motion for substitution of judges. However, defendant never presented this motion for hearing before trial, despite being present in court several times after filing the motion.

During the hearing on the post-trial motions, the judge gave defendant an opportunity to explain the basis of his motion for substitution of judges. That motion alleged that the judge had "acted improperly" in failing to hold an evidentiary hearing on defendant's earlier motion for appointment of private counsel and stated that the judge was a "potential witness" to the allegations of that motion. Although the transcript of the post-trial hearing is not entirely clear, defendant presumably was arguing that the trial judge was a possible witness to specific instances of the appointed counsel's alleged ineffective assistance, some of which had occurred in open court, and therefore, defendant contends, the judge should have removed himself from the case. The trial judge denied the motion for substitution of judges with little comment.

By statute, a defendant may obtain a new judge as a matter of right if he files the motion alleging prejudice within 10 days of his case being placed on the trial call. (Ill. Rev. Stat. 1989, ch. 38, par. 114—5(a); *People ex rel. Baricevic v. Wharton* (1990), 136 Ill. 2d 423, 430 ("[T]he defendant's right to substitute judges has long been interpreted by this court as an 'absolute' right," under this provision, and if the motion was timely filed within the 10 days the court would not "inquire into the truth of the allegations of prejudice").) Defendant did not file his motion within the time specified under this provision and we find it inapplicable. However, there is a separate provision, section 114—5(d), under which defendants may move to have a judge substituted upon a showing of "cause." (*Wharton*, 136 Ill. 2d at 429.) This

statutory provision states: "[A]ny defendant may move *at any time* for substitution of judge for cause, supported by affidavit. Upon the filing of such motion a hearing shall be conducted as soon as possible after its filing by a judge not named in the motion." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 38, par. 114—5(d).

The case law requires that motions brought pursuant to section 114—5(d) contain specific allegations. (See, *e.g., People v. Amos* (1990), 204 Ill. App. 3d 75, 86 (oral allegation that the judge "seemed hostile" to defendant held insufficient).) If the allegations are not sufficient, defendant is not entitled to a hearing before a different judge. (*People v. Marshall* (1988), 165 Ill. App. 3d 968.) In addition, the defendant must make the motion at the earliest practical moment after discovering the alleged prejudice. (See *People v. Taylor* (1984), 101 Ill. 2d 508, 518.) The satisfaction of such requirements insures that a motion for substitution of judges is not frivolously made.

The State contends that defendant waited too long to bring the motion to the attention of the court. We agree. Defendant abandoned his motion by failing to pursue it within a reasonable time after he filed it, in late July 1990. The trial did not begin until November 13, 1990, almost four months later, and defendant has provided no good reason why he could not have brought the motion to the attention of his counsel or the court at least by the time of trial.

In addition, we note that defendant's allegations purport to cast doubt upon the judge's impartiality to preside over the trial. Accordingly, we find it significant that defendant elected to waive the jury at the second stage of sentencing and thereby allow the trial judge to impose sentence. We hold that defendant's conviction will not be reversed for a new trial based on the claim that defendant should have received a hearing, before a different judge, on the motion for substitution of judges.

## V

Next, defendant argues that the trial court should have appointed new counsel to present his *pro se*, posttrial motion because his trial counsel labored under a conflict of interest and could not address the allegations of ineffective assistance of counsel. Defendant relies on *People v. Krankel* (1984), 102 Ill. 2d 181, which held that a defendant's *pro se* assertion of ineffective assistance of trial counsel warrants appointment of different counsel to represent the defendant during post-trial proceedings. However, later cases have clarified that *Krankel* did not announce a rule that automatically requires the appointment of new counsel to argue a defendant's claim of ineffective assistance of trial counsel. (*E.g., People v. Nitz* (1991), 143 Ill. 2d 82, 135 ("trial court's failure to appoint new counsel *** was harmless beyond a reasonable doubt"); *People v. Crane* (1991), 145 Ill. 2d 520, 533 (defendant's claim was without merit; defense counsel's strategy was based on defendant's desires, and, therefore, no additional hearing with new defense counsel was required); *People v. Williams* (1991), 147 Ill. 2d 173, 252 ("trial court conducted the necessary examination of the factual matters underlying defendant's claim" and defendant was not entitled to an evidentiary hearing on ineffective assistance of counsel).) In *Williams*, 147 Ill. 2d at 251, this court explained that " 'the trial court should examine the factual matters underlying the defendant's claim, and, if the claim lacks merit or pertains to matters of trial strategy, then no new counsel need be appointed. Only if the allegations show possible neglect of the case *** should new counsel be appointed.' " *Williams*, 147 Ill. 2d at 251, quoting *People v. Washington* (1989), 184 Ill. App. 3d 703, 711; *cf. People v. Finley* (1991), 222 Ill. App. 3d 571, 584 ("We do not decide whether [defendant] can successfully argue ineffective assistance of counsel in a post-trial proceeding; instead, we hold that the trial judge did not accord

[defendant's] claim proper consideration since it 'ha[s] potential merit' "), quoting *People v. Brandon* (1987), 157 Ill. App. 3d 835, 847.

Our review of *Krankel* and its progeny leads us to conclude that the operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the *pro se* defendant's allegations of ineffective assistance of counsel. In the case at bar, it does not appear that the court was presented with a particularly cogent argument at the post-trial hearing, on the issue of ineffective assistance of counsel. We have studied the transcript of the post-trial hearing, and we find that the trial court made a significant effort to explore the matters raised in defendant's motion. With the exception of the matters pertaining to defendant's request for appointment of counsel other than the public defender, the trial court addressed each of defendant's allegations of ineffective assistance of counsel. We conclude that under the circumstances of this case, the trial court's failure to conduct an inquiry into the request for private counsel does not require a remand for a new post-trial motion hearing, for the following reasons.

First, the trial court addressed defendant's dissatisfaction with his originally appointed counsel by allowing another attorney to take over the case. Although the court did not appoint private counsel, defendant did not object to the appointment of a second attorney from the public defender's office, nor did defendant demonstrate grounds for the disqualification of the public defender's office as a whole. Defendant's second appointed counsel raised numerous issues on behalf of the defense and, as the record indicates, preserved, in one form or another, virtually all of defendant's arguments, including his desire to have private counsel appointed. The trial court presided over all phases of the trial and was familiar

with the history of the entire case. Therefore, none of defendant's arguments were overlooked or ignored, even if the court did not enter a specific finding on defendant's request for private counsel.

Second, we have scrutinized the transcript of the hearing on the post-trial motion hearing and we find that the trial court conducted an adequate probe into the allegations of ineffective assistance of trial counsel. In his *pro se* motion for new trial, defendant did not bring to the trial court's attention a colorable claim of ineffective assistance of counsel. Instead, the allegations in the post-trial motion were conclusory, misleading, or legally immaterial. In the motion, defendant stated that he was denied effective assistance "where office of public defender never investigate[d] allegations of petitioner being beaten, under the influence of drugs while in police custody during interrogation[;] where state's attorney *** had medical reports and other reports could be obtain[ed] from hospital[;] [and] no preparation for petitioner['s] defense where investigators never attempted nor secured state key witness['] arrest records or records which would [show] witness indeed lied under oath to questioning." The trial court went over each of these allegations, individually, with defendant.

With respect to defendant's assertion that his attorneys failed to investigate his beating by the police, the record reveals that defendant testified in detail, both at the pretrial motion to suppress his confession and at the trial. Defendant's first attorney presented evidence of the beating in the pretrial motion to suppress defendant's confession. Defendant's second attorney presented evidence on that issue at trial. In addition to defendant's testimony that he was beaten, defense counsel called other witnesses to testify on behalf of defendant's claims. Therefore, we reject defendant's contention that his attorneys failed to investigate his allegations of police misconduct.

Similarly, defendant's allusion to being under the influence of drugs while in custody was not ignored by his counsel. On the contrary, this assertion was put into evidence during defense counsel's direct examination of defendant, who testified that he had ingested drugs while the police were in his home the morning they took him to the police station for questioning. The relevance of his alleged ingestion of drugs is questionable, in any event, because no one testified that defendant appeared incoherent or disoriented at the time he made his statements.

Defendant's next allegation of ineffective assistance of counsel refers to medical records that the State had or could have obtained from the hospital. His motion does not articulate which records he refers to or their relevance to any material issue of defense, but presumably he refers to records that might have supported his claim of being beaten. The transcript from the post-trial hearing indicates that the judge and the other attorneys, as well as defendant, discussed the records at some length during the post-trial hearing. Defendant did not explain how additional medical records would have affected the outcome of the motion to suppress or the trial itself. In addition, the trial court previously had assessed the evidence and credibility of the witnesses and had ruled that defendant's confession was not the result of a physical beating. The jury also heard and evaluated the defendant's version of the facts surrounding his confession. We conclude that the trial court did not err in refusing to appoint new counsel to review defendant's suggestion that his medical records were not properly obtained or presented.

Defendant argues that the State's "key witness" lied under oath; defendant told the court at the post-trial hearing that Bertha Jackson had spent time in prison and had lied at trial when she said she had not been in

contact with Sumlin. However, our review of the trial transcript reveals that Jackson admitted, upon defense counsel's cross-examination, that she had visited Sumlin in prison. As for her alleged criminal history, the prosecutor represented at the post-trial hearing that he was not aware of any criminal history of Bertha Jackson and defendant offered no substantiation of his assertion to the contrary.

We conclude that none of defendant's stated allegations, singly or in combination, raise a colorable claim of ineffective assistance of counsel that would require a further hearing with different counsel. Accordingly, we hold that the trial court did not commit reversible error in failing to appoint a third attorney for defendant, for purposes of presenting the post-trial motion based on ineffective assistance of the assistant public defenders.

## DEATH PENALTY ISSUES

### VI

Defendant attacks the constitutionality of the Illinois death penalty statute, arguing that it (1) improperly shifts the burden of proof to the defendant to establish sufficient mitigating evidence to avoid the sentence of death and (2) fails to adequately guard against the risk of arbitrary or capricious impositions of the death penalty. This court has previously rejected such arguments (e.g., People v. Ganus (1992), 148 Ill. 2d 466, 476; People v. Bean (1990), 137 Ill. 2d 65, 138-40), and we decline to reconsider those holdings. Defendant further contends that the Illinois death penalty act imposes fewer controls over the imposition of the penalty than the statutes of other States. However, this court previously has rejected challenges to the statute based on the fact that other jurisdictions have adopted different formulations of the death penalty. (See People v. Pasch (1992), 152 Ill. 2d 133.) Defendant advances no new argument in support of his challenges to the

constitutionality of the death penalty in this State. We decline to depart from our previous decisions.

## VII

Defendant argues that the State failed to prove, beyond a reasonable doubt, the existence of a statutory aggravating factor necessary to establish defendant's eligibility for the death penalty. Specifically, defendant claims that the State failed to prove that defendant had been convicted of murdering two or more individuals in separate acts, which the defendant intended or knew would cause death or create a strong probability·of death or great bodily harm to the murdered individuals. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(3).) According to defendant, the certified records used to establish defendant's prior murder conviction did not conclusively establish that defendant had acted with intent or knowledge that his acts would cause death or create a strong probability of great bodily harm.

We find no merit to this contention. The records of defendant's 1974 indictment for murder and armed robbery reveal that defendant pleaded guilty to the murder of the armed robbery victim. The indictment set out three separate counts of murder: intentional murder, knowing murder, and murder committed during the course of an armed robbery (felony murder). The 1974 indictment was read to the sentencing jury in the instant case. Since defendant's plea of guilty was not restricted to the felony murder count, the jury was apprised that defendant's plea of guilt applied to the knowing and intentional murder counts as well as murder in the course of armed robbery. (Cf. *People v. Thompkins* (1988), 121 Ill. 2d 401, 455-56 (where jury returns a general verdict of guilty after being instructed on intentional murder and alternative theories of homicidal intent arising out of a single transaction, presumption is that jury found defendant guilty of

intentional murder); accord *People v. Johnson* (1992), 149 Ill. 2d 118, 156-57.) In the case at bar, defendant's guilty plea was an admission that he murdered the victim, whom he also robbed. Accordingly, we believe that defendant's general plea of guilty to the tripart indictment for murder should be viewed as a plea to intentional and knowing murder as well as murder in the course of armed robbery. We conclude that the State sustained its burden of proving the statutory factors in support of defendant's eligibility for the death penalty.

## VIII

Defendant next argues that he was denied due process of law because the trial court refused defense counsel's request to ask the prospective jurors, on *voir dire*, whether they would automatically impose the death penalty if, upon defendant's conviction, the State requested the death penalty, just as the State is allowed to seek the exclusion for cause of those jurors who would automatically vote *against* the death penalty. (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.) The purpose of this question was to allow for the excusal for cause of those jurors who would automatically vote for the death penalty. Defendant relies on the decision of the United States Supreme Court in *Morgan v. Illinois* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222.

In *Morgan v. Illinois*, the Court reviewed its prior decisions of *Witherspoon* and *Ross v. Oklahoma* (1988), 487 U.S. 81, 101 L. Ed. 2d 80, 108 S. Ct. 2273, and observed:

"A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating

circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. *If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.*" (Emphasis added.) *Morgan v. Illinois,* 504 U.S. at 729, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229-30.

Since this court is bound by the decision in *Morgan v. Illinois* (see *People v. Smith* (1992), 152 Ill. 2d 229, 273-74 (vacating death penalty and remanding for new sentencing hearing in light of decision in *Morgan v. Illinois*); *People v. Cloutier* (1993), 156 Ill. 2d 483), we examine the facts of the case at bar in light of the facts and rationale of *Morgan v. Illinois.*

The defendant in *Morgan* requested the trial court to ask this question: "If you find [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" (*People v. Morgan* (1991), 142 Ill. 2d 410, 469.) The trial court refused to ask the venire this question on the ground that the court's other questions sufficiently inquired whether the prospective jurors could be fair and impartial and follow the law. However, the United States Supreme Court in *Morgan* expressly rejected the rationale that a juror's simple recitation of impartiality would suffice in this context and held that a defendant must have an equal opportunity to use the *voir dire* to "lay bare the foundation" of a challenge for cause against those prospective jurors who would always impose the death sentence following conviction. The *Morgan* Court observed that a defendant cannot intelligently exercise his challenge for cause against such potential jurors unless the defendant is permitted to question them about their views on the death penalty. *Morgan v. Illinois,* 504 U.S. at 734-35, 119 L. Ed. 2d at 506, 112 S. Ct. at 2232.

In the instant case, the State contends that defense counsel did not ask a "reverse-*Witherspoon*" question and therefore *Morgan* does not apply. The transcript reveals some confusion over the actual wording of the question that defense counsel requested the court to ask the venire: "Would you believe as a juror you must absolutely *oppose* the death penalty when requested by the State?" In his brief, defendant states that the word "oppose" was misunderstood by the court reporter or merely misspoken because it is obvious from the context and common sense that the intended word was "impose." The State argues to the contrary.

We find defendant's explanation of the proposed question persuasive because the trial court's comments indicate that the court understood the question as intended by defendant. After the court heard the question, the State objected on the grounds that the law did not require the type of inquiry proposed and that the court's other questions were adequate. The trial court sustained the State's objection, stating that it planned to inform the jury "that the death penalty is only one of the possible penalties that may be imposed by a jury. So, obviously there are other possibilities so that nobody is required to *impose* the death penalty." (Emphasis added.) These remarks reflect the trial court's understanding of defense counsel's question and the court's belief that such a question was unnecessary.

Defense counsel persisted in her argument, after the court sustained the State's objection, and said:

> "You know, they may not be required to, but you are asking the jury if there is something in their background where they cannot absolutely under any circumstances. There are people who absolutely insist on killing people for no reason at all or *they absolutely must if it's been requested by the State*, judge. You may say, yes, that's possible, but the juror may not feel there is any possibility at all they must do it." (Emphasis added).

In response, the court stated:

"Ma'am, I cannot follow the four or five suggestions you have given me. The only thing I can do is rule on the one you read me as a proposed question, and it's too vague. Your objection will sustain it. The proposed question you ready [*sic*] to me will be denied."

This verbatim transcription indicates that defense counsel's attempts to persuade the court to reverse its ruling on the proposed question were unartful, but that is not a reason to affirm the trial court's ruling. The court referred to "four or five" suggestions when in fact defense counsel was proposing only that the jurors be asked if the jurors believed they must impose the death penalty if the State requested it. The court also added that the question was vague, although presumably the court understood the question when it was originally propounded. The court's understanding of the question was evidenced by its initial ruling that the question was unnecessary because the jury would be adequately instructed on the law. This is precisely the rationale that the United States Supreme Court rejected in *Morgan v. Illinois.*

We hold that defense counsel's proposed question was a sufficient effort to bring before the venire a reverse-*Witherspoon* inquiry. Although the question in *Morgan* concerned the jurors' willingness to impose the death penalty based solely upon the defendant's *conviction* of murder, we find that the proposed question in the instant case similarly probes a prospective juror's potential unwillingness to follow the law impartially. (See *Cloutier*, 156 Ill. 2d at 499 ("There is no precise catechism or formula of questions" for the reverse-*Witherspoon* situation).) We conclude that the trial court committed reversible error in refusing to ask the potential jurors whether they would vote for the death penalty merely if so requested by the prosecution.

The State nonetheless urges this court to hold that

the defense *waived* the issue because counsel failed to reformulate the proposed question after the judge ruled. We do not agree. Vital constitutional rights do not turn on defense counsel's draftsmanship. We conclude that counsel's failure to rephrase the question did not operate as a forfeiture of defendant's constitutional right to have the jury questioned as requested.

The State next asks this court to hold that *Morgan* does not apply to the instant case for another reason, to wit: defendant's waiver of the jury for the hearing in aggravation and mitigation obviated the need for the trial court to "life-qualify" the venire because the jury was not the entity that ultimately imposed the sentence of death. The State contends that we should restrict the scope of *Morgan* to apply only to situations in which the jury is "the sentencing body." Under this reasoning, defendant would be precluded from raising a "*Morgan* claim" because he waived the jury after it had returned the death-eligibility verdict. The State's sole authority for this position is *People v. Jackson* (1991), 145 Ill. 2d 43, which this court decided before the United States Supreme Court rendered its decision in *Morgan v. Illinois. Jackson* directly relied on this court's opinion in *People v. Morgan*, however, and in light of the reversal of that opinion, *Jackson* is of limited assistance in deciding this issue.

After carefully considering the State's argument, we conclude that the application of waiver in this context would avoid the spirit of *Morgan v. Illinois* and move us in a direction that would circumvent the straightforward holding of the Supreme Court. We hesitate to draw fine distinctions between the first and second phases of the death sentence procedure in this context because we believe that the jury involved in any aspect of the death sentencing procedure must be fair and impartial.

In the case at bar, defendant was not permitted to

life-qualify the jury. After the jury found him eligible for the death penalty, it is not surprising that defendant then decided to allow the judge to make the final sentencing decision. If this court were to adopt the State's proposed dichotomy between the two stages of sentencing, for purposes of the *Morgan* doctrine, we would be taking a myopic view of the due process rationale espoused by the United States Supreme Court. From a constitutional standpoint the government may not " 'entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death.' " *Morgan v. Illinois*, 504 U.S. at 732, 119 L. Ed. 2d at 504-05, 112 S. Ct. at 2231, quoting *Witherspoon*, 391 U.S. at 521-22, 20 L. Ed. 2d at 784, 88 S. Ct. at 1776.

We conclude that defendant's death sentence must be vacated and the cause remanded for a new sentencing hearing.

## IX

Because we have held that defendant must receive a new sentencing hearing in accordance with *Morgan v. Illinois*, we need not discuss at length the remaining alleged sentencing errors, at least to the extent that the errors are not likely to recur. (*People v. Simms* (1991), 143 Ill. 2d 154, 173.) In this category is the argument that defendant was denied a fair hearing at the eligibility phase of sentencing because the jury may have become confused by contradictory statements of the prosecutor and defense counsel regarding the unanimity requirement. We note that the prosecutor's statement on this point wrongly informed the jury that the verdict must be unanimous, irrespective of whether they found defendant eligible or ineligible for the death penalty. We discourage the repeat of such a statement on retrial.

We decline to address defendant's claim that the trial judge, in making certain comments to the jury,

minimized the importance of the first phase of the death penalty hearing and the State's burden of proof regarding the nature of the defendant's prior murder conviction. However, we note our disapproval of any remarks by a court to a jury that might deprecate the seriousness of the proceedings or imply that a particular phase of trial or sentencing is "*pro forma.*"

Finally, defendant argues that he was denied the right to confront witnesses against him, in violation of the sixth amendment. This argument challenges the State's use of hearsay evidence in the aggravation phase of sentencing. Specifically, defendant objects to the State's use of the police officer's summary of defendant's role in the 1974 armed robbery and murder. In addition, defendant argues that his prison disciplinary reports were inadmissible hearsay evidence.

We reject defendant's argument that he was denied the right to confront witnesses at the aggravation phase of sentencing. This court has held that evidence containing hearsay may be admitted at death penalty hearings if the evidence is relevant and reliable (*e.g., People v. Young* (1989), 128 Ill. 2d 1, 53-54), and that the introduction of such evidence does not violate defendant's right to confront witnesses (*People v. Lyles* (1985), 106 Ill. 2d 373, 415-16). In *People v. Hall* (1986), 114 Ill. 2d 376, 416-17, this court held that admission of prison records at the sentencing hearing does not violate defendant's right to confront witnesses against him. See also *People v. Ward* (1992), 154 Ill. 2d 272, 328-30 (court did not abuse its discretion in allowing prison record to be introduced during the sentencing hearing); *cf. People v. Smith* (1990), 141 Ill. 2d 40 (defendant's prison records are inadmissible during the *guilt* phase of the trial).

For the reasons set forth in this opinion, we affirm defendant's conviction of murder based on the evidence and we reject his request for a new trial based on al-

leged trial errors. We further vacate the death sentence in accordance with *Morgan v. Illinois* and remand this cause to the circuit court for a new sentencing hearing.

*Conviction affirmed; death penalty vacated; cause remanded.*