THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT JOCKO, Defendant-Appellant.

First District (1st Division)   No. 1—07—0870

Opinion filed March 30, 2009.

Patricia Unsinn and Katherine M. Donahoe, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Michele Grimaldi Stein, and Karisa F. Flores, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Defendant Robert Jocko was charged with burglary. Specifically, he was accused of removing power tools, worth approximately $300, from a detached, residential garage in Berwyn, Illinois, on July 6, 2005. A neighbor and eyewitness to the burglary failed to identify defendant at trial, although he had previously identified defendant at a showup. The getaway van was registered *not* to defendant, but to someone else who happened to live in defendant's apartment building. The driver of the van was apprehended close to the scene, but the passenger escaped. Approximately an hour after the burglary, a plainclothes detective went to the address in Cicero, Illinois, where the van

was registered, and approached defendant when defendant happened to emerge from an apartment in the same building. Defendant was startled and fled; and the detective used a nearby broomstick to subdue him. Immediately after defendant had been subdued with a broomstick and handcuffed, the showup identifications occurred. An officer who had witnessed part of the burglary and an officer who had witnessed the flight immediately after the burglary gave conflicting, initial descriptions of the passenger in the getaway van; but both officers identified defendant as the passenger at the showup. The State introduced no fingerprint evidence from the burglarized garage, from the getaway van or from the tools carried by the burglars from the garage and later recovered by the police from the van. A co-owner of the garage testified that she may have left the garage door open.

After a jury trial in March 2007, defendant Robert Jocko was convicted of burglary. On April 6, 2007, the circuit court of Cook County sentenced him to 12 years in prison. The co-offender, Joseph Ball, had been sentenced by the same trial judge to four years in prison. On appeal, defendant claims: (1) that the trial court erred by failing to ask potential jurors whether they understood and accepted the principle that the defendant's failure to testify cannot be held against him; (2) that the trial court refused to rule on defendant's motion *in limine* concerning the admissibility of his prior convictions for impeachment purposes and thereby prevented defendant from making an informed decision about whether to testify; and (3) that the trial court failed to address defendant's *pro se* allegations that he was deprived of effective assistance of counsel. For the following reasons, we remand to permit the trial court to inquire into defendant's claims of ineffective assistance of counsel.

## BACKGROUND

### 1. *Pretrial Motions and Documents*

Prior to trial, motions were filed *both* by defense counsel and by defendant acting *pro se*. On November 17, 2005, an assistant public defender filed a motion to quash defendant's arrest and suppress evidence. After a hearing on February 16, 2006, at which three police officers testified, the trial court denied the motion to quash. Defendant's *pro se* pretrial motion was filed April 25, 2006, and was entitled "motion to dismiss for violation of due process." The motion made a number of allegations. The allegations relating to counsel are quoted below:

> "2. Actual and substantial prejudice to the defendant has results from Counsel was not present during ARRAIGNMENT or BAIL HEARING ***.

* * *

6. That when Cook County Sheriff brought me from one lock up area to other.

7. That I asked Sheriff acouple [sic] of times to talk to a Public Defender while in the second lockup area ***.

8. That while waiting to see Judge for ARRAIGNMENT & BAIL for 15 to 20 min. in lock up area 2, asked to talk to the Public DEFENDER and was told 'YES' wait ***.

9. That as I was brought ### out of lock up area to hall way door to court room for awhile, STILL TALK TO NO COUNSEL.

10. That we went in front of Judge for ARRAIGNMENT & BAIL HEARING ***.

11. That Judge did not ask where my counsel was then asked what charges are. Denial of assistance of counsel altogether, either actually or constrictly [sic] is presumable [sic] prejudicial. ***

12. That the State's Attorney read charges of Burglary and resisting errest [sic], Denial of Assistance of Counsel altogether, either actually or ###### constrictly [sic], is presumable [sic] prejudicial. ***

13. That the Bail was set at 100,000."

There is no dispute that the trial judge knew of defendant's motion. The half-sheet contains an entry for April 25, 2006, that states: "Jail Mail Request For Motion To Dismiss For Violation of Due Process." In addition, at a proceeding on May 2, 2006, the trial court observed that the defendant's *pro se* motion was "recorded, and it was put on the call for today's date."

However, on May 2, 2006, defendant was not present; and the matter was rescheduled for May 25, 2006. On May 25, 2006, there was no discussion of defendant's motion. The May 25 transcript indicates that the case was called; that Assistant Public Defender James J. Mularski announced that he was appearing on behalf of the defendant; that the trial court asked "[w]hat date do you want?"; that the assistant defender replied "6-27 by agreement, please"; that the court agreed; and that was all that transpired on May 25. Defendant claims on appeal that his motion was not discussed on any subsequent day; and the State does not dispute this fact.

On September 6, 2006, Assistant Public Defender Rick Fadell took over as defendant's counsel. On that date, Mr. Fadell indicated to the trial court that his client had provided "some information on potential witnesses."

After Assistant Public Defender Fadell's appointment, defendant sent an undated letter to the clerk's office. The envelope, which is also part of the appellate record, was postmarked "Chicago IL 606, 13 DEC 2006 PM 8 T" and is stamped "FILED 2006 DEC 14 AM 11:13" by

the clerk of the circuit court of the Fourth District. In pen on the back of the letter, someone wrote "12-20-06 opened."

While the half-sheet contained an entry for defendant's "Jail Mail" motion filed on April 25, it does not contain an entry for this letter. In its appellate brief, the State admits that "[t]here is no indication in the record that the complaints raised in defendant's letter were addressed by the court."

The letter claimed that defendant's new public defender, Rick Fadell, had failed to enter into evidence "certain affidavits and subpoenas" and a 911 conversation. The letter stated in full:

"Dear circuit Clerk,

I am writing in regards of my lawyer not raissing [sic] certen [sic] issues in my case that is material and relevant evidence that pertain to my case.

I would like for this letter to be placed in my master filed as a legal document in case I have to argue on an appeal, can you please stamp this with a legal notification. I would like a copy of this legal document sent to me as soon as possible[,] thank you!

I have requested certain affidavits and subpoenas to be entered and my lawyer has advised me that it would notbe [sic] to my best interests, and I have also requested for the 911 Motor Rola converstion [sic] to be entered as evidence in my behalve [sic] and his statement responce [sic] was that they do not hold them after thirty days.

My lawyers [sic] name was Tim Muarlarski for several months, then he with-drew [sic] from my case[.] [N]ow I have Rick Fiedell [sic] [who] has not been fighting my case to the best of interest.

Sincerely

Mr. Robert Jocko"

There is a third pretrial document in the appellate record, in which defendant alleges lack of assistance of counsel. However, on appeal, defendant does not argue that this document is part of the basis of his claim that the trial court failed to inquire. The appellate record contains a typed document entitled "Affidavit" that is dated "9-6-06" in pen and signed by defendant. In the affidavit, defendant stated that he submitted it in support of a motion to suppress; and he made several allegations about the circumstances surrounding his arrest. The only allegation concerning legal representation was that: "[p]olice held me in custody and brought me before an alleged victim with out [sic] affording me the right to have a lawyer present and depriving me of other legal rights." Assistant Public Defender Mularski had filed a motion to quash arrest and suppress evidence that was denied after a hearing on February 16, 2006. This affidavit is dated several months after the motion had already been heard and denied.

## 2. *Voir Dire*

Jury selection for defendant's trial began on March 6, 2007. During *voir dire*, the trial court asked certain questions of prospective jurors as a group, and then posed certain questions individually to prospective jurors. The group questions included questions about whether they understood and accepted: (1) that a defendant is presumed innocent; (2) that he is not required to offer any evidence in his own behalf; and (3) that he must be proved guilty beyond a reasonable doubt. However, neither the group nor individual questions asked whether the prospective jurors understood and accepted that a defendant's failure to testify in his own behalf cannot be held against him.

Concerning the presumption of innocence, the trial court asked:

"THE COURT: Now I'm going to ask certain questions to you as a group. Do you all accept that [a] person accused of a crime is presumed to be innocent of the charges against them? Do you all accept that presumption of innocence?

(All prospective jurors indicating.)

THE COURT: And do you understand that the presumption of innocence stays with the defendant throughout the trial and is not overcome unless from all of the evidence you believe the State has proved his guilt beyond a reasonable doubt. Do you all agree with that and accept that?

(All prospective jurors indicating.)"

Concerning the State's burden of proof, the trial court asked:

"THE COURT: Do you understand the State has the burden of proving the defendant's guilt beyond a reasonable doubt? Do you all understand that?

(All prospective jurors indicating.)"

Concerning the lack of any need for the defendant to offer evidence, the trial court asked:

"THE COURT: And do you all understand the defendant does not have to present any evidence on his own behalf and prove his innocence. Do you all understand and accept that?"

The trial court asked a couple of more questions before the transcript again stated: "(All prospective jurors indicating.)"

Prior to asking these questions, the trial court had addressed the prospective jurors as a group to explain some basic principles of the law. As part of this address, the trial court informed the prospective jurors: (1) that a defendant is presumed innocent; (2) that he is not required to offer any evidence in his own behalf; and (3) that he must be proved guilty beyond a reasonable doubt. However, the trial court did not state that a defendant's failure to testify in his own behalf cannot be held against him. The trial court stated, in pertinent part:

"Under the law, a defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict. And it is not overcome unless from all of the evidence in the case you're convinced beyond a reasonable doubt the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains on the State throughout the case. The defendant is not required to prove his innocence nor is he required to present any evidence on his own behalf. He may rely on the presumption of innocence."

### 3. *Trial*

After jury selection, defendant's counsel filed two motions *in limine*. The first motion sought to bar the State from introducing evidence of defendant's prior convictions. The trial court ruled: "At this present time, I would grant the motion with regard to the [State's] case in chief and reserve ruling on prior convictions for impeachment [if the defendant testifies]." The second motion sought to bar the State from introducing evidence of the struggle that ensued when police officers tried to arrest defendant. The trial court ruled: "And this is part of the chain of events and the Court would find first, that it goes to a consciousness of guilt and secondly, it is just part of the full occurrence. And therefore, that motion would be denied."

After jury selection and motions on March 6, 2007, the trial commenced on March 7, 2007. At trial, six witnesses testified, all called by the State. The first witness, Luis Andrade, was an eyewitness to the burglary but he could not identify defendant in court, even though he had identified defendant at a showup identification on the day of the burglary. The next two witnesses, Carmen Cruz Santiago and her husband, Hiram Rivera, were the burglary victims; and Santiago testified that she may have left the garage door open. The last three witnesses were police officers who participated in the arrest of defendant and Joseph Ball, a co-offender. The State did not introduce any fingerprint evidence from the garage, the getaway van or the tools that were carried by the burglars from the garage and later recovered by the police from the van. The State also conceded that the getaway van was *not* registered to defendant.

Luis Andrade, the neighbor who witnessed the burglary, testified as follows. On July 6, 2005, at approximately 4:30 p.m., he was driving his vehicle in the alley behind his home and he was about to pull into his garage, when he observed a blue van parked in the alley. Detached residential garages line both sides of the alley, including a garage for Andrade's home and a garage for the home at 3511 Ridge Avenue,

near where the blue van was parked. Andrade observed two white[1] males wearing tee shirts and shorts, one with short hair and one with long hair. At trial, Andrade was not able to identify defendant as one of these two men. The prosecutor asked the following questions and Andrade gave the following answers:

"ASSISTANT STATE'S ATTORNEY: At this time I ask you to look around the courtroom. Do you see either of these men in court today?

ANDRADE: No.

ASSISTANT STATE'S ATTORNEY: You don't recognize anyone in court as being one of these two?

ANDRADE: No."

Andrade testified that when he first observed the two men, they were trying to put gas in the van, with a gas can they had obtained from the garage at 3511 Ridgeland. The overhead garage door of that garage was open, from the time that Andrade arrived at the scene. After parking his own vehicle, Andrade closed his garage, entered his home and went into the kitchen. Through his kitchen window, Andrade observed the two men enter and exit the garage three or four times, carrying tools from the garage and into the van. Shortly after Andrade called 911 on his cellular telephone, the two men entered the van, and the van drove away. Andrade went into the alley, and a burgundy van drove down the alley and stopped next to him.

Andrade testified that the driver of the burgundy van was a police officer, that he informed the officer what he had just observed, and that the officer started following the blue van. After the officer drove off, Andrade went to the house of the neighbors whose garage was just burglarized. Carmen Cruz Santiago answered the door; he informed her what happened; and then he returned home. At approximately 5:20 p.m., a police squad vehicle arrived at his home, and a Berwyn police officer drove him to 3812 Lombard, in Berwyn. Andrade identified a man at that location as the man with short hair whom he had observed in the alley. The police then drove Andrade to 35th Street and 56th Street in Cicero, at approximately 5:45 p.m. At this second location, Andrade identified a male as the man with long hair whom he had also observed in the alley. Andrade testified that the second man was dressed in different clothes than when Andrade last saw him.

On cross-examination, Andrade testified that his entire description of the two men to the 911 dispatcher was that they were white

[1]The presentence report and the arrest record indicate that defendant is Native American, of medium complexion.

men, wearing jeans shorts and tee shirts; that one had short hair and one had long hair; and that one of the tee shirts was white. Andrade had never seen either man before. The location where Andrade identified the second man, 35th Street and 56th Court in Cicero, is approximately two miles from Andrade's home. The police officers showed Andrade only one man to identify, and that individual was not wearing jeans shorts.

Carmen Cruz Santiago testified that she lived at 3511 Ridgeland Avenue. At approximately 4:15 p.m. on July 6, 2005, she drove home and parked her vehicle in her garage. The overhead door of the garage opens into an alley. After she backed her vehicle into her garage, her vehicle was facing toward the alley and she observed a blue van drive by, with two men inside, one in the driver's seat and one in the front passenger seat. The man in the front passenger seat had light skin; and both men "were looking into the garage." After Santiago exited her vehicle, she exited the garage by a side door. She did not recall whether she left the overhead door open, or whether she locked the side door. She testified that the garage contained power tools, as well as regular tools. Approximately 20 minutes later, her neighbor Luis Andrade knocked on her back door. She then went to her garage and noticed that some power tools were missing, and called her husband. Officer Gamino from the Berwyn police department came to her house, and she reported the missing tools. After her husband arrived home, the two of them made a list of the missing tools and brought it to the Berwyn police station at approximately 6:30 p.m. At the station, the police asked them to go to the parking lot behind the station, where Santiago observed the blue van, as well as tools from her garage lying on the ground. Santiago and her husband identified some of the tools, as well as a tool box, as being those taken from their garage; and the police photographed their tools. At trial, Santiago identified photographs of their tools and the blue van. Santiago testified that the blue van in the photograph was the same blue van that she had observed passing by her house and the same van that was parked behind the Berwyn police station.

On direct examination, Santiago testified that she did not recognize the defendant; and on cross-examination, she testified that she did not recall seeing him by her garage and that she could not identify the two men in the van. On cross, Santiago also testified that she did not observe any signs of forced entry to her garage.

Hiram Rivera, Santiago's husband, testified that he identified his tools at the Berwyn police station. Rivera also testified that he kept gas cans filled with gas in the garage and that several were missing. Rivera identified a photograph with two groups of tools: one group consisted of his tools, and the other group did not belong to him.

Officer Robert Trofimchuk testified that he was an auxiliary police officer with the Berwyn police department and that on July 6, 2005, he was assigned to the park district detail. After hearing a radio transmission, he drove his maroon van into an alley, and observed a blue van parked in the alley and two men walking back and forth between an open garage and the van. The two were white men, with brown hair, approximately 190 pounds and 5 feet 11 inches, and dressed in tee shirts and shorts. One had a ponytail. Officer Trofimchuk observed the two men walk back and forth between the garage and the van three times, and then enter the van, and drive away. Officer Trofimchuk testified that a person in the alley "flagged" him down and stated "officer, that is them." Officer Trofimchuk then followed the blue van. When the blue van stopped because of traffic, Officer Trofimchuk pulled behind it, activated the police lights on his vehicle and instructed the driver to place his van in park. Officer Trofimchuk testified that the driver smiled and accelerated through traffic and that the van was then pursued by Officer Gamino, who was in a police squad vehicle. Officer Trofimchuk followed in his maroon van.

Officer Trofimchuk testified that after the blue van was pulled over, the driver and passenger exited and ran. Officers Trofimchuk and Gamino pursued the driver, who they later learned was Joseph Ball, and took him into custody. In response to a radio transmission, Officer Trofimchuk drove to 35th Street and 56th Court in Cicero, where he observed a man in custody. Officer Trofimchuk identified this man as the defendant, and as one of the men whom Officer Trofimchuk had previously observed entering and exiting the garage. Officer Trofimchuk testified that he subsequently observed a "showup" of the defendant to Andrade, at the same location. Officer Trofimchuk testified that defendant's appearance in court was different from his appearance on the day of the burglary, in that on the day of the burglary his hair was longer and he had a small patch of facial hair beneath his lower lip. Over defense objection, the trial court admitted defendant's arrest photograph into evidence. In the photograph, defendant's eyes are nearly closed and appear as slits.

On cross-examination, Officer Trofimchuk testified that when he observed the two men walking back and forth between the garage and the van, he could not discern whether they were carrying anything. He also testified that the driver had short hair. On redirect examination, when asked if he saw the faces of the two men as they walked back and forth between the garage and the van, he answered: "More of their profile."

Officer Gamino testified that he received a dispatch about a possible burglary. After arriving at Pershing and Kyler, Officer Gamino

observed Officer Trofimchuk try to make a stop of the blue van, which ignored his commands and left. Officer Gamino pursued the van approximately two blocks, when the van stopped and two occupants fled. Officer Gamino testified that he and Officer Trofimchuk pursued and apprehended one subject, who was later identified as Joseph Ball. After Andrade identified Ball, Officer Gamino transported Andrade to an address in Cicero where another suspect was in custody. Officer Gamino testified that he was able to observe the suspect as he fled from the van, that he identified the person in custody as that suspect, and that this individual was also the defendant in the courtroom. Officer Gamino also testified that Andrade made a positive identification of defendant at the location in Cicero.

Officer Gamino testified that defendant appeared differently in court than he did on the day of the burglary. Officer Gamino testified that at trial defendant had short hair and a moustache, whereas on the day of the burglary he had long hair and no mustache. Officer Gamino testified that he later reviewed his police report and realized that he had made a "typographical" error. He stated:

> "In the description of the subjects radioed in and written in the report I transposed the driver and passenger. Describing the passenger, I identified him as the driver and the passenger I identified him as the driver."

On cross-examination, Officer Gamino admitted that his report described the driver as having long hair and the passenger, who had escaped from the scene, as having short hair. He testified that his report was wrong and that he never submitted a supplementary report to correct the mistake. Officer Gamino also testified that while he was transporting Luis Andrade to Cicero, he told the witness that "we had a possible suspect in custody and that we needed him to make an identification." Officer Gamino testified that, when he and Andrade arrived at the location in Cicero, defendant, who was the alleged passenger, was in handcuffs and had long hair. Officer Gamino testified that Andrade remarked that Andrade thought defendant was "wearing different clothes" from the burglars whom he had observed earlier. Officer Gamino also testified that the individuals who had run from the van were both wearing tee shirts and jeans shorts.

Detective Michael Ochsner of the Berwyn police department testified that on July 6, 2005, he was keeping surveillance on a multiunit apartment building, which was the address to which the van was registered, when he observed defendant exit one of the units. At the time, Detective Ochsner was in plain clothes and sitting in an unmarked vehicle. Defendant appeared differently on the day of the burglary than he did at trial. On July 6, defendant had long hair and

some facial hair below his lip; while at trial, defendant had a moustache.

Detective Ochsner testified that, approximately an hour after the burglary, he observed defendant exit a unit, walk downstairs, retrieve a bicycle that was leaning against the building, walk toward the parkway and mount the bicycle. Detective Ochsner then approached and identified himself as a police officer. Defendant appeared startled and started to flee. Detective Ochsner grabbed the bicycle. Defendant jumped off the bike, pushed the detective backwards and ran in a clockwise loop back toward the apartment building. The detective ran after him and radioed for backup. Eventually, the detective used a nearby broomstick to subdue defendant; and the detective jumped on top of defendant and kept him subdued, until other officers arrived. On cross-examination, Detective Ochsner testified that defendant's name was not on the van's registration.

After the jurors began deliberating, they sent a note that stated:

"Need part of transcript referring to whether Mr. Jocko came out of the specific apartment to which the van was registered, or did he come out of that building generally?

Please specify number of units in the building."

The trial court informed them to rely on their own memory and that transcripts were not available. Subsequently, the jury returned a verdict of guilty.

On April 6, 2007, Assistant Public Defender Fadell filed a posttrial motion for a new trial, which the trial court denied and proceeded to sentencing. Although all the witnesses had stated that the burglars had been white men, the presentence report noted that defendant was Native American. The trial court stated that the minimum available sentence was 6 years, and then sentenced defendant to 12 years. The assistant State's Attorney observed that the trial judge had sentenced Joseph Ball, the co-offender who had pled guilty, to 4 years in prison. Defendant moved to reconsider sentence, which the trial court denied. Defense counsel then filed a notice of appeal.

## ANALYSIS

Defendant claims (1) that the trial court erred by failing to ask potential jurors whether they understood and accepted the principle that the defendant's failure to testify cannot be held against him; (2) that the trial court refused to rule on defendant's motion *in limine* concerning the admissibility of his prior convictions for impeachment purposes and thereby prevented defendant from making an informed decision about whether to testify; and (3) that the trial court failed to address defendant's *pro se* allegations that he was deprived of effective assistance of counsel.

## Questioning the Venire

First, defendant claims that the trial court failed to question the potential jurors about whether they understood and accepted the principle that the defendant's failure to testify could not be held against him. Defendant claims that this failure violated both (1) amended Illinois Supreme Court Rule 431(b) (eff. May 1, 2007); and (2) the Illinois Supreme Court's holding in *People v. Zehr*, 103 Ill. 2d 472 (1984).

Defendant acknowledges that his trial occurred before the effective date of the amendment to Rule 431(b), but he argues that this court should apply the amendment retroactively—even though three divisions of this court have rejected this same argument. *People v. Gilbert*, 379 Ill. App. 3d 106, 111 (1st Dist. 4th Div. 2008) (the amendment "does not apply retroactively to *voir dire* conducted prior to May 1, 2007"); *People v. Martinez*, 386 Ill. App. 3d 153, 162 (1st Dist. 5th Div. 2008) ("we concur in the holdings of our fourth division *** [in *Gilbert*], and our sixth division" in *Yarbor*); *People v. Yarbor*, 383 Ill. App. 3d 676, 684 (1st Dist. 6th Div. 2008) ("[w]e reach the same conclusion" as *Gilbert*)). Defendant argues that if this court rejects his claim for retroactive application, we should nonetheless find that, even before the amendment, the thrust of it was required under *Zehr*—an argument that this court has also rejected before. *Gilbert*, 379 Ill. App. 3d at 109 (prior to amendment, trial court was not obligated to inquire, absent a request by defense counsel); *Martinez*, 386 Ill. App. 3d at 161. See also *People v. Stump*, 385 Ill. App. 3d 515, 520 (4th Dist. 2008).

In *Zehr*, our supreme court held that a trial court erred during *voir dire* by refusing the defense counsel's request to ask potential jurors about their understanding and acceptance of the State's burden of proof, about defendant's right not to testify, and about the presumption of innocence. *Zehr*, 103 Ill. 2d at 476-78. The supreme court held that "essential to the qualification of jurors in a criminal case is that they know [(1)] that a defendant is presumed innocent, [(2)] that he is not required to offer any evidence in his own behalf, [(3)] that he must be proved guilty beyond a reasonable doubt, and [(4)] that his failure to testify in his own behalf cannot be held against him." *Zehr*, 103 Ill. 2d at 477. These four principles are now commonly referred to as "the *Zehr* principles." *Martinez*, 386 Ill. App. 3d at 158; *Gilbert*, 379 Ill. App. 3d at 109; *Yarbor*, 383 Ill. App. 3d at 681.

To ensure compliance with *Zehr*, the supreme court amended Rule 431(b) in 1997 to provide that, if requested by defendant, the trial court shall ask potential jurors whether they understand and accept the *Zehr* principles. 177 Ill. 2d R. 431, Committee Comments, at lxxix.

The amendment sought to "end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." 177 Ill. 2d R. 431, Committee Comments, at lxxix.

Supreme Court Rule 431(b), as amended in 1997 and in effect at the time of defendant's trial, stated in full:

> "(b) If requested by the defendant, the court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." 177 Ill. 2d R. 431(b).

This court has held that Rule 431(b), as amended in 1997 and in effect at the time of defendant's trial, did not require the trial court to ask about the *Zehr* principles, unless defense counsel asked the trial court to do so. *Gilbert*, 379 Ill. App. 3d at 109-10, citing *People v. Williams*, 368 Ill. App. 3d 616, 623 (2006), and *People v. Foreman*, 361 Ill. App. 3d 136, 146 (2005); *Martinez*, 386 Ill. App. 3d at 160-61.

In *People v. Pearson*, 356 Ill. App. 3d 390 (2005), the second division of this court held that, while the trial court was not required to *ask* about the *Zehr* principles unless asked to do so by defense counsel, the trial court had an obligation to *inform* the venire about the *Zehr* principles, whether defense counsel asked or not. In the first part of the *Pearson* opinion, this court held: "The rule does not require the trial court to *ask* the questions unless they are requested by defense counsel." (Emphasis added.) *Pearson*, 356 Ill. App. 3d at 397. Next, the *Pearson* opinion stated:

> "We conclude Rule 431(a) requires trial judges to *inform* prospective jurors about a defendant's basic rights, as set out in Rule 431(b), so that they will be informed about their 'general duties and responsibilities.' 177 Ill. 2d R. 431. Failure to do so is error." (Emphasis added.) *Pearson*, 356 Ill. App. 3d at 400.

The *Pearson* opinion thus draws a distinction between "ask," which was required only upon a defendant's demand, and "inform," which was required, with or without a defendant's demand.

However, the second division was directed to vacate its *Pearson*

opinion by our supreme court. *Pearson*, 892 N.E.2d 993 (2007) (decision without published opinion) (in the exercise of its supervisory authority, our supreme court ordered the appellate court to vacate its judgment). In addition, other divisions of this court have disagreed with the reasoning in *Pearson*. For example, the fourth division stated:

> "We cannot agree with the *Pearson* court that the supreme court would, in subsection (b), leave it to defense counsel to decide whether the trial court should inquire into the jurors' understanding of the *Zehr* principles but would, in subsection (a), make the trial court's failure to inform the jurors of those principles reversible error, even absent a request by defense counsel." *Foreman*, 361 Ill. App. 3d at 146.

Accord *Martinez*, 386 Ill. App. 3d at 160 (fifth division; rejecting *Pearson* and agreeing with *Foreman*); *Williams*, 368 Ill. App. 3d at 625 (fourth division; rejecting *Pearson* and agreeing with *Foreman*).

■ Effective May 1, 2007, the Illinois Supreme Court amended the rule to delete the first five words: "If requested by the defendant." Ill. S. Ct. R. 431(b) (eff. May 1, 2007). This deletion had the effect of requiring the trial court to make an inquiry, whether or not the defendant requested it.

After the 2007 amendment, this court was asked to apply the amendment to *voir dire* proceedings that occurred prior to the amendment's effective date of May 1, 2007. In three published opinions, this court rejected the idea of retroactive application. *Gilbert*, 379 Ill. App. 3d at 111 (the amendment "does not apply retroactively to *voir dire* conducted prior to May 1, 2007"); *Martinez*, 386 Ill. App. 3d at 162; *Yarbor*, 383 Ill. App. 3d at 684.

In all three opinions, retroactive application was rejected for the following reasons. In *People v. Brown*, 225 Ill. 2d 188 (2007), our supreme court held that, where the legislature has expressly provided for the delayed implementation of a statute, such a provision demonstrates that the law was intended to have only prospective application. *Brown*, 225 Ill. 2d at 201, discussed in *Yarbor*, 383 Ill. App. 3d at 683-84; *Gilbert*, 379 Ill. App. 3d at 111; *Martinez*, 386 Ill. App. 3d at 162. "Similarly, in the present case, the amendment to Rule 431(b) was adopted on March 21, 2007, and had an effective date of May 1, 2007." *Yarbor*, 383 Ill. App. 3d at 684; *Gilbert*, 379 Ill. App. 3d at 111; *Martinez*, 386 Ill. App. 3d at 162. "If we apply the holding in *Brown*, the supreme court, by delaying the amendment's effective date, expressed the intent that the amended rule would apply prospectively only." *Yarbor*, 383 Ill. App. 3d at 684; *Gilbert*, 379 Ill. App. 3d at 111; *Martinez*, 386 Ill. App. 3d at 162. Like the other divisions before us, we find this reasoning persuasive.

Defendant has not cited a case where a court applied the amendment retroactively. Instead, defendant calls our attention to the fact that our supreme court has granted leave to appeal in a case where the trial court refused to ask the venire about the defendant's right to testify, even after the defense counsel made a request. *People v. Glasper*, No. 1—04—3005 (November 21, 2006) (unpublished order under Supreme Court Rule 23), *appeal allowed*, 223 Ill. 2d 650 (2007). In *Glasper*, the appellate court held that the trial court committed error, but that the error was harmless in light of the overwhelming evidence of defendant's guilt. Since the defense counsel in *Glasper* made a request, retroactive application of the amendment was not at issue there. As a result, reversal or affirmance of *Glasper* by our supreme court would have little bearing on the case before us.

For the foregoing reasons, we reject defendant's argument for retroactive application of the amendment.

## Trial Court's Failure to Rule on Motion

■ Second, defendant claims that the trial court prevented defendant from making an informed decision about whether to testify, when the trial court refused to rule on defendant's motion *in limine* to preclude the State from using defendant's prior convictions to impeach him if he testified. The trial court indicated that it would rule on the motion only if defendant testified and after he did so; and defendant did not testify. After briefing on appeal in the case at bar was complete, our supreme court ruled on this same issue. In *People v. Patrick*, 233 Ill. 2d 62 (2009), our supreme court held, first, that "a trial court's failure to rule on a motion *in limine* on the admissibility of prior convictions when it has sufficient information to make a ruling constitutes an abuse of discretion." *Patrick*, 233 Ill. 2d at 73. However, our supreme court also held that a defendant fails to preserve for appeal the issue of the trial court's refusal to rule on the admissibility of his prior convictions, when the defendant does not testify at trial. *Patrick*, 233 Ill. 2d at 77. Since the defendant in the case at bar did not testify, *Patrick* requires us to find that defendant's second claim was not preserved for appellate review.

## Ineffective Assistance of Counsel

Third, defendant claims that the trial court failed to address his *pro se* allegations, made before trial, that he was denied effective assistance of counsel. Defendant asks us to apply to pretrial claims the same rules developed in *People v. Krankel*, 102 Ill. 2d 181, 189 (1984), and its progeny for the handling of posttrial *pro se* claims of ineffective assistance of counsel. See also *People v. Moore*, 207 Ill. 2d 68, 77-82 (2003) (discussing *Krankel* and its progeny); *People v. Chapman*,

194 Ill. 2d 186, 227-31 (2000) (same); *People v. Johnson*, 159 Ill. 2d 97, 124 (1994) (same); *People v. Nitz*, 143 Ill. 2d 82, 133-36 (1991) (same). The State responds that the *Krankel* rules should not apply to pretrial claims. This is a case of first impression.

### a. *The Krankel Blueprint for Trial Courts*

■ Our supreme court has provided our trial courts with a clear and detailed blueprint for how to handle posttrial *pro se* claims of ineffective assistance of counsel. A trial court is not required to appoint new counsel every time a defendant files a *pro se* posttrial motion claiming ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 77; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124; *Nitz*, 143 Ill. 2d at 134. Instead, the trial court must first examine the factual basis underlying the defendant's claim. *Moore*, 207 Ill. 2d at 77-78; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124; *Nitz*, 143 Ill. 2d at 134. "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Moore*, 207 Ill. 2d at 78; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124; *Nitz*, 143 Ill. 2d at 134. However, the trial court should appoint new counsel, if the defendant's allegations "show possible neglect of the case." *Moore*, 207 Ill. 2d at 78; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124; *Nitz*, 143 Ill. 2d at 134. If new counsel is appointed, the new counsel would then represent the defendant at a posttrial hearing on the defendant's claims of ineffective assistance of trial counsel. *Moore*, 207 Ill. 2d at 78; *Nitz*, 143 Ill. 2d at 135.

To decide whether or not to appoint new counsel, the trial court must conduct "some type of inquiry into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of [trial] counsel." *Moore*, 207 Ill. 2d at 79; *Chapman*, 194 Ill. 2d at 230. The trial court's inquiry should include "some interchange between the trial court and trial counsel regarding the facts and circumstances" of defendant's allegations. *Moore*, 207 Ill. 2d at 78. The trial court may base its determination: (1) on the trial counsel's answers and explanations; (2) on a "brief discussion between the trial court and the defendant"; or (3) "on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79; *Chapman*, 194 Ill. 2d at 228-31 (trial court's inquiry was adequate where it "repeatedly inquired [of defendant] as to precise allegations of ineffectiveness" and it conducted an extensive review of "trial counsel's performance").

### b. *The Krankel Blueprint for Appellate Courts*

On review, even if an appellate court finds that a trial court made

an error, it will not reverse if it finds that the error was harmless. *Moore*, 207 Ill. 2d at 80; *Nitz*, 143 Ill. 2d at 135. Our supreme court has held that "[a] trial court's failure to appoint new counsel to argue a defendant's *pro se* posttrial motion claiming ineffective assistance of counsel can be harmless beyond a reasonable doubt." *Moore*, 207 Ill. 2d at 80; *Nitz*, 143 Ill. 2d at 135 (error was harmless, where trial court held hearing to obtain testimony of witnesses whom defendant alleged his counsel should have called, and where defendant was allowed to submit any questions he wanted to ask the witnesses). However, for the appellate court to be able to conduct a harmless error analysis, there must be enough of a record made concerning defendant's claims of ineffective assistance, for the appellate court to evaluate the trial court's ruling. *Moore*, 207 Ill. 2d at 81 (no harmless error analysis was possible because "no record at all was made"). If the trial court conducted no inquiry and made no ruling, the appellate court may need to remand for "the limited purpose" of allowing the trial court to make an inquiry and ruling. *Moore*, 207 Ill. 2d at 81 (remanded "for the limited purpose of allowing the trial court to conduct the required preliminary investigation"); *Krankel*, 102 Ill. 2d at 189 (remanded for a new hearing on defendant's *pro se* posttrial motion based on ineffectiveness of trial counsel, with appointed counsel different than trial counsel).

On appeal, the standard of review changes, depending on whether the trial court did or did not determine the merits of defendant's *pro se* posttrial claims of ineffective assistance of counsel. Our supreme court has held that if the trial court made no determination, then our standard of review is *de novo*. *Moore*, 207 Ill. 2d at 75. Distinguishing our supreme court's decision in *Moore*, this court has held that if the trial court did make a determination on the merits, then we will reverse only if the trial court's action was manifestly erroneous. *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008) (distinguishing *Moore* and explaining why the *de novo* standard did not apply); see also *People v. Dixon*, 366 Ill. App. 3d 848, 852 (2006). In the case at bar, defendant asks us to apply a *de novo* standard of review; and the State does not specify the appropriate standard of review.

While it is certainly the better practice for the trial court to make a specific determination concerning defendant's *pro se* motion, a reviewing court may conclude that the trial court made a determination "in essence" if the trial court considered defendant's allegations, conducted an adequate inquiry and did not grant the motion. *People v. Ford*, 368 Ill. App. 3d 271, 276 (2006) ("record shows that the court considered defendant's allegations" and made a determination "in essence"); see also *Johnson*, 159 Ill. 2d at 126 (even though the trial

court failed to make a "specific finding" on defendant's motion, our supreme court found that "the trial court conducted an adequate probe into the allegations").

Our supreme court has stated repeatedly that the main task of an appellate court is to decide whether the trial court conducted an "adequate inquiry" into defendant's posttrial allegations of ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 78; *Chapman*, 194 Ill. 2d at 230; *People v. Bull*, 185 Ill. 2d 179, 210 (1998); *Johnson*, 159 Ill. 2d at 125.

### c. *Pleading Requirements*

■ Our supreme court has held that a "*pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention." *Moore*, 207 Ill. 2d at 79. For example, in *Johnson*, even though our supreme court found that defendant's allegations were "conclusory, misleading or legally immaterial," it noted with approval that the "trial court went over each of these allegations, individually, with defendant" and thereby "conducted an adequate probe." *Johnson*, 159 Ill. 2d at 126. See also *Moore*, 207 Ill. 2d at 78, 81, discussing with approval *People v. Parsons*, 222 Ill. App. 3d 823, 828 (1991) ("[w]hile defendant did not formally present a *pro se* petition," his oral statements at a posttrial hearing should have triggered an inquiry by the trial court).

While acknowledging these rulings by our supreme court, the appellate court has enacted, in effect, pleading requirements for the defendant. *People v. Bobo*, 375 Ill. App. 3d 966, 985 (2007) (no inquiry by the trial court was required where "defendant failed to identify relevant facts" and "raised only a general conclusory allegation that his trial counsel failed to preserve issues for appeal"); *c.f. People v. Ford*, 368 Ill. App. 3d 271, 276 (2006) (no remand was necessary where "defendant's allegations were facially insufficient" and trial court "considered" defendant's allegations "as they arose"). This court has held that a defendant had to meet "minimum requirements" to trigger even a preliminary factual inquiry by the trial court. *Bobo*, 375 Ill. App. 3d at 985. We stated: "[a] bald allegation of ineffective assistance is insufficient; the defendant must raise specific claims with supporting facts before the trial court may consider the allegations." *Bobo*, 375 Ill. App. 3d at 985; see also *People v. James*, 362 Ill. App. 3d 250, 257 (2005) (a trial court has "no duty to investigate the defendant's claim if it is patently without merit or unsupported by factual allegations").

### d. *Parties' Arguments*

Defendant cites two cases for the proposition that the *Krankel*

blueprint, recited above, also applies to the handling of pretrial claims. *People v. Watkins*, 232 Ill. App. 3d 719, 731-34 (1992); *People v. DeRossett*, 262 Ill. App. 3d 541, 543-46 (1994). These two cases are readily distinguishable because they involved both pretrial and posttrial claims.

Even though *Watkins* and *DeRossett* are distinguishable, this is not the first time that the appellate court has been presented with solely pretrial claims and with the State's argument that *Krankel* and its progeny do not apply to them. However, instead of ruling on whether *Krankel* applied to pretrial claims, we have affirmed by finding that, in any event, the trial court's inquiry was adequate. For example, in *Ford*, the State argued that *Krankel* did not apply to pretrial claims and, in the alternative, that the trial court's inquiry was adequate. *Ford*, 368 Ill. App. 3d at 275. Without ruling on whether *Krankel* applied to pretrial claims, the appellate court found that defendant's allegations were insufficient and the trial court had considered them. *Ford*, 368 Ill. App. 3d at 276; see also *People v. Clark*, 374 Ill. App. 3d 50, 67-68 (2007) (affirmed where trial court conducted adequate inquiry into pretrial claims); *James*, 362 Ill. App. 3d at 257-58 (affirmed where trial court conducted "pretrial examination of defendant's claim" and claims were "patently without merit").

No party cites a case to this court in which an appellate court considered the issue and specifically held that *Krankel* and its progeny should be applied to pretrial claims.

■ The State argues that we should not apply *Krankel* to pretrial claims because, first, no court has done so; and second, a pretrial inquiry would force defense counsel to reveal his or her trial strategy. First, while no appellate court has specifically ruled that *Krankel* applied to pretrial claims, the appellate court has applied *Krankel*'s analysis to pretrial claims in three cases: *Ford*, 368 Ill. App. 3d at 276; see also *Clark*, 374 Ill. App. 3d at 67-68; *James*, 362 Ill. App. 3d at 257-58. Second, a pretrial inquiry would not necessarily force counsel to reveal strategy, since the trial court must inquire only enough to determine whether there is "possible neglect." *Moore*, 207 Ill. 2d at 78; *Chapman*, 194 Ill. 2d at 230; *Johnson* 159 Ill. 2d at 124; *Nitz*, 143 Ill. 2d at 134. Once the trial court determines that a claim "pertains only to matters of trial strategy," it does not need to inquire further. *Moore*, 207 Ill. 2d at 78; *Chapman*, 194 Ill. 2d at 230; *Johnson* 159 Ill. 2d at 124; *Nitz*, 143 Ill. 2d at 134.

Third, as a matter of judicial economy, it makes more sense to encourage defendants to bring their claims of ineffective assistance of counsel to a trial court's attention before trial, rather than after. If there is a problem, it can be cured, before all the parties and witnesses

go through the time and expense of a trial that may later be overturned on a postrial motion or on appeal. For these three reasons, we find that *Krankel* and its progeny should be applied to pretrial claims.

### e. *Application of Krankel to Case at Bar*

■ Having determined that the *Krankel* rules apply, we must next decide whether defendant's claims survive both (1) the pleading requirements developed by the appellate courts (*e.g., Bobo*, 375 Ill. App. 3d at 985); and (2) the harmless error analysis required by our supreme court. *Moore*, 207 Ill. 2d at 80; *Nitz*, 143 Ill. 2d at 135.

This case presents a very unusual and unique set of facts. In the case at bar, a trial court reviewed the defendant's claims, determined that they merited an inquiry, and scheduled court dates for that inquiry—twice. But his claims were never heard. They were simply lost in a shuffle of changing attorneys and adjourned dates. Their loss makes the wheels of justice seem completely random, almost like a roulette wheel. This, we cannot tolerate.

The pleading requirements present no bar, because they are the requirements needed to trigger an inquiry by the trial court; and that trigger was already tripped in this case. *Bobo*, 375 Ill. App. 3d at 985. The harmless error analysis presents no bar, because that applies only when there is enough of a record made concerning defendant's claims, for an appellate court to evaluate the trial court's denial of new counsel. *Moore*, 207 Ill. 2d at 81 (no harmless error analysis was possible because "no record at all was made"). Here, there was no record, no ruling, and no reasoned basis for dispensing with defendant's claims—only a slip through the cracks.

Our supreme court has held that when the trial court conducts no inquiry and makes no ruling, we may remand for the limited purpose of allowing the trial court to inquire and to rule. *Moore*, 207 Ill. 2d at 81 (remanded "for the limited purpose of allowing the trial court to conduct the required preliminary investigation"); *Krankel*, 102 Ill. 2d at 189 (remanded for a new hearing on defendant's *pro se* posttrial motion based on ineffectiveness of trial counsel, with appointed counsel different than trial counsel). Thus, we remand for this purpose.

## CONCLUSION

On appeal, defendant claimed: (1) that the trial court erred by failing to ask potential jurors whether they understood and accepted the principle that the defendant's failure to testify cannot be held against him; (2) that the trial court refused to rule on defendant's motion *in limine* concerning the admissibility of his prior convictions for

impeachment purposes and thereby prevented defendant from making an informed decision about whether to testify; and (3) that the trial court failed to address defendant's *pro se*, pretrial allegations that he was deprived of effective assistance of counsel.

In sum, we hold first that, at the time of defendant's trial, a trial court was not required to ask potential jurors whether they understood and accepted the principle that the defendant's failure to testify cannot be held against him, unless the court was requested to do so by defense counsel. Since, in the case at bar, defense counsel failed to make a request, the trial court was not required to ask. Second, while this appeal was pending, our supreme court held that, when a defendant chooses not to testify at trial, he fails to preserve for appeal the issue of the trial court's refusal to rule on the admissibility of his prior convictions. *Patrick*, 233 Ill. 2d at 77. Since, in the case at bar, defendant did not testify, this issue is not preserved for appeal. Third, the trial court failed to inquire about defendant's pretrial claims of ineffective assistance of counsel; and the requirement to inquire, as embodied in *Krankel* and its progeny, applies to pretrial claims. *Krankel*, 102 Ill. 2d at 189; *Moore*, 207 Ill. 2d at 77-82 (discussing *Krankel* and its progeny).

For the foregoing reasons, we remand for the limited purpose of allowing the trial court to inquire into defendant's claims of ineffective assistance of counsel.

Remanded with instructions.

HALL and GARCIA, JJ., concur.