NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210504-U

NO. 4-21-0504

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 6, 2022
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| HAMMET DEONDRE BROWN, | ) | No. 18CF652 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |
| | ) | Honorable |
| | ) | J. Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Knecht and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed, concluding that the trial court (1) did not improperly base its guilty finding at defendant's bench trial for first degree murder on a belief that defendant had a duty to retreat prior to acting in self-defense and (2) properly conducted a *Krankel* hearing and appropriately determined that defendant did not show possible neglect of his case.

¶ 2        In July 2018, the State charged defendant, Hammet Deondre Brown, with six counts of first degree murder (720 ILCS 5/9-1(a) (West 2018)) and two counts of attempt (first degree murder) (*id.* § 8-4, 9-1(a)). Defendant was charged with shooting and causing the death of Steven Alexander and Teneshiea Brown and the attempted murders of Tyree Jones and Kenleia Sims.

¶ 3        At a February 2021 bench trial, defendant testified and asserted that he fired his gun on the date in question because he was acting in self-defense. The trial court rejected that claim and found him guilty of all counts. The court later sentenced defendant to serve two life

sentences plus two 31-year prison sentences.

¶ 4 Defendant appeals, arguing that (1) the trial court deprived him "of his rights to due process and a fair trial by basing its findings of guilt on its mistaken belief that [defendant] had a duty to retreat prior to acting in self-defense" and (2) because defendant demonstrated during the *Krankel* hearing that his trial counsel possibly neglected his case, this case should be remanded for an attorney to be appointed to investigate and litigate his claims of ineffective assistance of counsel.

¶ 5 We disagree with both of defendant's claims and affirm.

¶ 6 I. BACKGROUND

¶ 7 Several witnesses testified in this case regarding (1) the events leading up to the shooting on June 10, 2018, (2) the circumstances surrounding the shooting itself, and (3) the events after the shooting. Because defendant admits he fired his gun at Steven Alexander, one of the victims who died, but claims he did so in self-defense, this court's focus will be on the circumstances surrounding that shooting, particularly given that defendant's primary challenge on appeal is that the trial court did not properly apply the law on self-defense. Accordingly, we will discuss the events leading up to and after the shooting only to the extent that they might be pertinent to the circumstances of the shooting and defendant's claim of self-defense.

¶ 8 As this court reviews the evidence, we are favored by the comprehensive and detailed findings of fact provided by the trial court, which was the trier of fact in this case. The court's remarks comprise 38 pages of transcript. We have determined that the trial court in its remarks has correctly described the evidence presented at trial, and we note that defendant on appeal does not challenge any of the court's factual findings. Instead, defendant challenges the court's application and understanding of the law regarding self-defense.

¶ 9                           A. The Events Leading up to the Shooting

¶ 10          Defendant testified that he first came into contact with Steven Alexander and Tyree Jones in late April or early May of 2018 when defendant was selling cannabis at a convenience store in Bloomington. Alexander and Jones also had cannabis for sale and became hostile toward defendant. Feeling threatened, defendant left the store in his gold Ford station wagon.

¶ 11          A few weeks later, defendant was driving the same station wagon toward his home when a silver Dodge Intrepid pulled up behind him. Defendant could see in his rearview mirror that Alexander was in the car and Amari McNabb was driving. Defendant did not know their names until later. The men in the Intrepid chased him to his apartment. When defendant got out of his car, the men in the Intrepid opened their car doors and "pump-faked" him, which is apparently a gesture suggesting or pretending that they were holding the grip of a weapon.

¶ 12          Defendant testified he became scared and anxious because he realized the people who chased him knew what car he drove and sometimes his children were in that car. He told his friend Duane Martin that same day about the incident with the Intrepid, and Martin testified at trial to confirm he had been so informed.

¶ 13          A few days later, defendant spoke to Tarune "Ron Ron" Moon about both incidents and described the silver Intrepid to him. Moon showed defendant some pictures on Snapchat to help him identify the people involved in these incidents. When defendant recognized the people involved, Moon told him that one of them was Alexander, Moon's cousin, and that Alexander was part of a local gang known as the "200s." Moon also said that McNabb and Jones were part of the 200s.

¶ 14          A few days after defendant's conversation with Moon, defendant attended a bonfire at which several vehicles pulled up and a group of people got out, including McNabb, Jones, and

Alexander. Defendant approached them "to try to resolve the situation," but they scattered. As defendant later drove away, he saw a dark-skinned male with "dreads" firing a gun at his car. Defendant sped off and was eventually pulled over by the police. He did not give the police the names of the people involved because he was selling cannabis for a living and he wanted to have as little police contact as possible. He also did not think the police would take the incident seriously.

¶ 15 Officer Shane Bachman testified that on May 25, 2018, he pulled defendant's vehicle over because it had a malfunctioning headlight. When defendant stopped his car, he immediately got out, put his hands up, and told the officer that he had been shot at. Defendant's legs were shaking, his voice was trembling, and he seemed upset. Defendant told Bachman he had been at a bonfire when a group of people showed up and started an argument. He decided to leave, but as he did so, he was shot at four or five times.

¶ 16 Defendant provided Bachman a description of the cars involved, and the police succeeded in finding one of them three blocks away. One of the people in that car was McNabb. Defendant ultimately told Bachman that he did not want to file a report because "God would deal with the people who shot at him."

¶ 17 Martin testified that he was also at the bonfire with defendant when a group of teenagers showed up and defendant told Martin that these were the people who had previously chased him. Martin approached the young men, and at first, things remained calm. But when defendant joined him, the young men took off running. That scared Martin, so he decided it was time for all of them to leave. They got in their respective cars and, as Martin was leaving, he heard three or four gunshots.

¶ 18 B. The Events on the Day of the Shooting

¶ 19        On the evening of June 9 and early morning hours of June 10, 2018, defendant attended a barbecue outside his apartment building that he helped set up. Defendant had been present for hours before Alexander and Jones arrived. Moon was also at the barbecue. Defendant became nervous because Moon had posted some pictures of him to Snapchat, and defendant knew Alexander was Moon's friend on Snapchat.

¶ 20        Defendant testified that he was armed, and he saw other people at the barbecue were also armed. Defendant went to get some food at a neighbor's apartment, and after he ate, he went outside to get some lemonade. On his way to get lemonade, defendant was approached in a dark spot between buildings by Alexander and Jones. Teneshiea Brown was behind them, but defendant did not realize she was with them. He did not know Kenleia Sims at the time and did not remember whether she was there.

¶ 21        Defendant saw that Alexander had a black snub-nosed revolver in his waistband, and Alexander said to defendant, "Finally got you." Defendant thought he was going to be shot, grabbed his own gun from his pocket, and fired four shots while moving backwards. He hit Alexander somewhere in his lower body. Defendant then heard other gunshots "that were muffled like they were coming from a revolver." He did not know if it was Alexander or Jones who was firing at him or someone else. So, he fired more shots as he ran away. Defendant claimed that he was afraid for his life and he believed that if he did not draw his own weapon he would have been killed.

¶ 22        Nathaniel Caldwell Sr. attended the same barbecue and testified that between 30 and 50 people were present. Caldwell saw Alexander there and spoke to him. About five minutes later, Caldwell heard gunfire, looked up, and saw defendant firing shots and running away. Caldwell did not see anyone else firing shots.

¶ 23    Nicole Tinker was in her bedroom at the time of the shooting. She heard three or four very loud shots, a pause, and then another burst of shots that sounded further away. She also heard screaming and heard someone outside say, "Get the gun, get the gun."

¶ 24    Jones testified that he went to the party with Alexander, his friend of many years, and they met Brown and Sims, whom they knew well, at the party. Jones testified that the four of them were just standing around talking when he heard gunfire. He claimed he did not know the shooter, who was six or seven feet away from their group when he started shooting. He testified that he had never seen defendant before that night and had no idea why defendant would shoot at him and his friends. Jones suffered one gunshot wound to his knee.

¶ 25    Sims testified that Alexander, Jones, and Brown were all like siblings to her. They were all together at the party, and she did not see any of them with a gun that night. She testified that defendant walked past their group once and then came back a minute or two later and just started shooting at them. She said that none of them pulled out a gun or fired back. She ran away and saw Brown fall down. Sims suffered a gunshot wound to her leg and later picked defendant out of a photo array as being the shooter.

¶ 26    Detective Ryan Strebing and Officer Tyler Elston were close enough to the shooting to hear the gunshots around 1:05 a.m. on June 10, 2018, and went immediately to the scene of the shooting, which was approximately eight blocks away. Strebing heard only three shots, but Elston heard five or six shots, a short pause, and then three more shots.

¶ 27    Elston provided emergency aid to Alexander at the scene and did not see a gun on or near Alexander's body. Between 50 and 100 people were at the crime scene shortly after the shooting. Both Alexander and Brown died as a result of gunshot wounds.

¶ 28    Over the next two days, police detectives found eight shell casings that were all

fired from the same firearm, as well as two projectiles that were also consistent with having been fired from the same weapon as each other. All the recovered casings and fragments could have been fired from a Hi-Point .40-caliber weapon, which was the weapon defendant fired that night.

¶ 29                     C. The Events After the Shooting

¶ 30           Immediately after the shooting, defendant ran to the home of Sean Robinson. Then Moon and Demetrius Moore also showed up, and they were both armed. Moon and defendant got into an argument during which Moon said that he hoped defendant had not just shot his little cousin (Alexander) because if defendant had, Moon said he was "going to pop [him]." Defendant denied that he shot Alexander. Moore then stopped any further confrontation, and Moon and Robinson gave defendant a ride to a convenience store.

¶ 31           A clerk from the convenience store testified that defendant was a regular customer and he was not acting abnormally in the store in those early morning hours. Surveillance footage from the convenience store confirmed the clerk's impression.

¶ 32           Defendant testified that he felt he could not go back to his apartment because he was afraid of retaliation from the 200s, so he went first to Indiana and then to Chicago. On the way out of town, he threw the .40-caliber firearm into a river.

¶ 33           Two days after the shooting, defendant made three calls to the Bloomington Police Department's nonemergency line to provide anonymous tips about Alexander's killing. Defendant gave the names of Moore and Moon, among other names, to the police in the hope that if the police questioned them, "the truth of what happened would come out."

¶ 34           Late in June 2018, the police conducted a court-authorized overhear of a phone conversation between defendant and Martin. A recording of the conversation was played at defendant's bench trial. During the call, defendant spoke about being wanted by the police and

told Martin that defendant was down to five "bumpers" or guns. Defendant told Martin that because he could not take the gun apart, he had to throw it in the river. Defendant also said the following: "We upped one on them, we upped one on everybody down there. We upped one on everybody, Folks, cause they always thought it was gonna be candy ass. They finally came to our mo' fucking front doorstep."

¶ 35     When defendant testified at his trial, he explained that this statement was his explanation that he had acted in self-defense after Alexander and Jones "upped" on the night of the shooting.

¶ 36     The police eventually arrested defendant in Chicago and brought him back to Bloomington. When they served him with a copy of his arrest warrant, defendant denied even knowing three of the four alleged victims. When he was in custody, he also lied to people on the phone about what had happened, claiming that he was not involved in the shooting at all.

¶ 37                    D. The Trial Court's Findings

¶ 38     In February 2021, defendant waived his right to a jury trial, and the trial court conducted a multi-day bench trial. When the trial was concluded, the court took the matter under advisement. Ten days later, the trial court reconvened, reviewed the evidence in great detail (comprising 38 pages of transcript), and announced its decision finding defendant guilty beyond a reasonable doubt of all of the charges against him. In so concluding, the court stated that it did not know why defendant shot those four people, but "what I am convinced of beyond a reasonable doubt is that there was no justifiable reason for these shootings and killings, including self-defense."

¶ 39     At the 35-page mark of the transcript, during which the trial court explained its reasoning for finding defendant guilty of all charges, the court made certain statements that are the

basis of defendant's claim on appeal that the court based its findings of guilt on its mistaken belief that defendant had a duty to retreat prior to acting in self-defense. The court's statements are the following:

"This [(being defendant's description of his three encounters with Alexander that the court had just discussed)] is all relevant to the Court because self-defense is an immediate threat, someone who has to take actions based upon an immediate danger of harm. Here the defendant, by his own testimony, has at least three dangerous encounters with Steven Alexander. One where fake pumping [*sic*] is going on and possibly a weapon being present. Another where he was shot at three to four times at the bonfire by Steven Alexander two weeks before. At the party on June 10th he feels the need to get the .40[-]caliber Hi-Point when the sun goes down because of a chance that someone would come over and he may need to shoot someone. At 11:30 or 12:00 he has a drink with Steven Alexander's cousin who doesn't drink, which concerns him, and then [Moon] advertises his location on Snapchat, which concerns him.

Based upon all of this, the Court has questions as to at what point do you leave the party to avoid the encounter in the first place? Self-defense is, in essence, someone who has no other choice. It certainly appears to the Court that based upon the facts, this situation had escalated to the point to where the encounter could have been avoided."

¶ 40                                   E. The Posttrial Motions and Sentencing

¶ 41        After defendant was convicted, his attorney filed posttrial motions, and defendant also *pro se* filed motions that alleged his trial counsel had provided him with ineffective assistance

during the trial.

¶ 42    In July 2021, the trial court conducted a *Krankel* hearing during which defendant and his trial counsel addressed the claims defendant made about counsel's alleged ineffectiveness. After conducting the *Krankel* hearing, the trial court took the matter under advisement.

¶ 43    Three weeks later, in August 2021, the trial court entered a five-page written order, which comprehensively and in detail reviewed the evidence presented and the claims made at the *Krankel* hearing. In that order, the court stated that it had determined there was no merit in defendant's allegations and, accordingly, no need to appoint counsel to investigate his claims.

¶ 44    The trial court then proceeded to sentence defendant as earlier stated—namely, to serve the rest of his life in prison.

¶ 45    This appeal followed.

¶ 46                          II. ANALYSIS

¶ 47    Defendant appeals, arguing that (1) the trial court deprived him "of his rights to due process and a fair trial by basing its findings of guilt on its mistaken belief that [defendant] had a duty to retreat prior to acting in self-defense" and (2) because defendant demonstrated during the *Krankel* hearing that his trial counsel possibly neglected his case, this case should be remanded for an attorney to be appointed to investigate and litigate his claims of ineffective assistance of counsel.

¶ 48    We disagree with both of defendant's claims and affirm.

¶ 49    A. Defendant's Claim That the Trial Court Based Its Findings of Guilt

on Its Mistaken Belief That Defendant Had a Duty To Retreat Prior to

Acting in Self-Defense

¶ 50    We earlier discussed the evidence presented at defendant's bench trial, particularly

defendant's testimony underlying his claim of self-defense. We will not repeat that discussion but will highlight some aspects of that testimony and make specific reference to observations and findings made by the trial court as trier of fact.

¶ 51                                    1. *The Trial Court's Review of the Evidence*

¶ 52          The trial court began its remarks by explaining it had considered the testimony and exhibits presented at trial, as well as the arguments of counsel. The court also noted that, "unlike a jury trial, a bench trial allows the court to explain, at least in part, certain considerations it's made in reaching a verdict, and I will attempt to do that in this ruling."

¶ 53          The trial court explained that defendant acknowledged shooting the four individuals the State accused him of shooting but he "claims that he was acting in self-defense and legally justified in the actions he took."

¶ 54          Significantly, in our judgment, the trial court also commented that after taking the case under advisement, the court reviewed not only its notes and the exhibits presented at trial but also "reviewed the Illinois Pattern Jury Instructions for the charges that have been filed. I considered the assertion of self-defense and the lesser-mitigated circumstances for second degree murder."

¶ 55          Regarding defendant's claim that he was acting in self-defense when he fired the shots, the trial court stated the following:

> "For the defense of self-defense, the defendant must initially show some evidence that, one, unlawful force was threatened against him, two, the danger of harm was imminent, three, that he was not the aggressor, four, that he actually believed danger existed and force was necessary to [a]vert that danger, and five, that his beliefs were reasonable. Once the defendant has met his burden, the burden

- 11 -

of proof shifts back to the State to prove beyond a reasonable doubt that the defendant did not act in self-defense."

In our judgment, it is significant that the court, in its legally correct discussion of self-defense, never mentioned anything about a defendant's supposed duty to retreat prior to acting in self-defense.

¶ 56       The trial court referred to Caldwell's testimony, pointing out that Caldwell knew Alexander, saw him at the party, and did not see him with a firearm. About five minutes after Caldwell spoke with Alexander, Caldwell heard gunshots but did not hear any arguing or commotion prior to the shots. Caldwell did not see anyone with a gun besides defendant and did not see anyone other than defendant do any shooting. Caldwell said no one was chasing defendant while he was shooting. Caldwell saw Alexander running and then collapse.

¶ 57       The trial court mentioned the testimony of Jones, who said 30 to 40 people were at the party and neither he, Alexander, nor the women had a gun. Jones said that he and Alexander were just talking when someone started shooting. Jones could not identify the shooter and had no idea why he was shooting at them. Jones was shot in the knee.

¶ 58       The trial court also referred to the testimony of Sims, who testified that neither she, Alexander, Jones, nor Brown had any weapons. She testified that while the four of them were talking, defendant walked through them toward the cut in the buildings and nothing was said. One or two minutes later, defendant came back and began shooting at Alexander, who did not retaliate or pull out a gun. She also said that Jones did not pull out a gun and she saw no one fight back. She turned and ran and saw Brown fall. Sims was shot in the leg.

¶ 59       Dr. Scott Denton performed the autopsies of Alexander and Brown and concluded that because there was no soot or stippling on their bodies, the gunshots were more than 18 to 24

inches away. The size of their wounds was consistent with a .40-caliber gun.

¶ 60　　　　The trial court also referred to the circumstances regarding the stop of defendant's vehicle by Officers Bachman and Gibson on May 25, 2018, when the first thing defendant said to them was that he had just been shot at but did not state by whom.

¶ 61　　　　The trial court carefully examined defendant's testimony, including both what he said about the June 10 shooting incident itself and the events involving Alexander, Jones, and Moon, in the weeks before the shooting occurred. The court noted that on the night of the shooting, defendant said he was just "kicking back, smoking weed, eating, and drinking," and then when the sun went down, he put the .40-caliber Hi-Point in his pocket because he was "afraid of the night" and a chance that someone might come over and he might need to possibly shoot. The court referred to defendant's testimony that (1) he was approached by Alexander and Jones and (2) Alexander said, "I finally got you." Defendant said Alexander had a gun in his right hand and was "shooting going up." Defendant stated that he heard shots coming his way and that Alexander had a black snub-nosed revolver. The court stated that defendant said he thought his life was threatened when Alexander "upped the gun." The court noted that defendant said he heard shots, so he "upped his gun" and shot.

¶ 62　　　　The trial court then discussed at some length defendant's conduct after the shooting, such as where he went and with whom.

¶ 63　　　　The court also made reference to the testimony of Martin, who spoke about the incident at the bonfire two weeks before the shooting. Martin said that the kids at the bonfire ran when defendant approached them. Martin said it was time to go, and as he and defendant were leaving, Martin heard three or four gunshots. Martin testified that defendant was "pissed" after the incident, but after a mediation, it was decided it would be left alone.

¶ 64 Martin also testified to the incident with the silver Intrepid following defendant. He said that people in the car "pump-faked" and defendant pump-faked them back. Defendant told Martin after the incident that he was "so thirsty," which Martin took as defendant's wanting to shoot them.

¶ 65 Defendant argued that the people who were responsible for the shooting were Alexander and Jones. He argued that those individuals tracked him and finally cornered him, leaving him no choice other than to take the actions that he did. Defendant argued that the prior incidents involving them made him fear for his safety and gave him a reasonable belief that his life was in danger when he encountered Alexander and Jones at the June 10 party.

¶ 66 2. *The Trial Court's Findings and Conclusion*

¶ 67 After summarizing the evidence, the trial court observed that it was presented with two completely different versions of events. The court explicitly found Caldwell to be credible. The court noted that Jones was evasive, and the court found "little to no credibility in his testimony." The court found Sims to be credible in her testimony regarding the circumstances of the shooting.

¶ 68 Regarding the incidents involving Alexander and Jones before the shooting on June 10, the trial court stated it had no doubt there was a dispute between defendant and Alexander but its precise circumstances were not clear to the court. However, the court stated it believed Martin when he said after the pump-faking incident that defendant said he wanted to shoot them. That statement by defendant, along with his statement to the police that he did not want to give a report or give names as to who was shooting at him because "God would take care of it," were deemed by the court as relevant to establish defendant's state of mind.

¶ 69 It was at this point in the trial court's recitation of the evidence that it made the

remarks of which defendant complains, arguing they were improper because they showed the court based its findings of guilt on its mistaken belief that defendant had a duty to retreat prior to acting in self-defense. However, we note that the court, after making those remarks, continued with its observations that defendant's demeanor in the convenience store video was normal, even after he just shot four people in what he claimed to be self-defense. The court also noted that defendant's calm demeanor in the convenience store video was inconsistent with his demeanor after the bonfire incident when he told the police he had just been shot at. At that time, the police noted that defendant's legs were shaking and his voice was trembling.

¶ 70　　　　The trial court also mentioned the consensual overhear with Martin during which, among other things, defendant stated, according to the court, "[W]e upped one on them, we upped one on everyone down there. Quote, they thought it was going to be candy-ass. Quote, they finally came to our doorstep." Martin then responded, "[T]hey weren't ready for that, Bro," to which defendant responded, "I was telling them that, folks. I kept telling them, folks, if something happens to me, it ain't going to be nice." The court observed that it was "certainly difficult to see self-defense in these statements that are taking place after the incident."

¶ 71　　　　The trial court also noted that a few weeks later, when defendant was being transported back to Bloomington, he told the officers that he did not know Alexander or Jones, the victims named in the arrest warrant for defendant.

¶ 72　　　　The trial court then summed up the evidence as follows:

> "In the court's view, there is inconsistency after inconsistency in the defendant's testimony, which leads the Court to seriously question his credibility. But even if I accepted the defendant's testimony as true, it still shows the situation that it escalated to the point to where a reasonable person would have extricated

themselves from this party long before this confrontation ever took place. That, in the Court's view, negates the self-defense claim. But even if that were not the case, Ms. Sims' and Mr. Caldwell's testimony is the credible testimony in this case and is supported by the physical evidence."

¶ 73 The trial court then concluded by stating it did not know why defendant shot the four victims but it was convinced beyond a reasonable doubt that there was no justifiable reason for these shootings and killings, including self-defense. "The State has the high and substantial burden to prove their case beyond a reasonable doubt. Based upon the totality of the evidence, I'm convinced they've done it."

¶ 74 3. *The Trial Court's Remarks Were Not Improper*

¶ 75 We reject defendant's claim that the trial court indicated in its remarks that it was somehow basing its finding of guilt on its mistaken belief that defendant had a duty to retreat prior to acting in self-defense.

¶ 76 First, we note that this very experienced trial court began its remarks by stating, after it mentioned that defendant was asserting self-defense, that the court had reviewed the Illinois Pattern Jury Instructions pertinent to the charges against defendant. Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (approved October 26, 2018) (hereinafter IPI Criminal No. 24-25.06) defines use of force in defense of a person as follows:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended to cause death or great bodily harm only if he reasonably believes that such force is

necessary to prevent imminent death or great bodily harm to himself." IPI Criminal No. 24-25.06.

¶ 77    IPI Criminal No. 24-25.06, of course, contains no reference whatsoever to any notion of a defendant's "duty to retreat prior to acting in self-defense." Defendant's claim that this experienced trial court would have added that burden to a defendant claiming self-defense, despite the court's having just reviewed what the elements of self-defense are, is completely without merit.

¶ 78    Second, we view the trial court's remarks questioning "at what point do you leave the party to avoid the encounter in the first place" to be the court's musings about the totality of the evidence and circumstances with which it was presented. A possible explanation for why the court was musing on that subject may have been the closing argument of defense counsel, which the court made reference to during the course of its lengthy findings. Counsel argued the following to the court:

> "Shocking to most of us how [defendant] and [Moon] would be hanging out, each with a gun, but in the underworld, in the gang world, it's like the old west, it's like the mafia, people carry guns when you're amongst each other. It's just the way it is. I submit to the court that no guns were fired then [(this is apparently a reference to after the shooting when defendant encountered Moon)] because [Moon] respected the result, the result of his little cousin picking on somebody he wasn't ready for, he wasn't ready to step up, somebody who was ready to defend himself."

¶ 79    In its concluding remarks, the trial court noted that counsel "has eloquently argued and likened this case to [the] old westerns where everyone carried a gun, and shootouts were not that uncommon with no one being held responsible." The court noted that neither it nor any other court would accept the lawlessness of the old west as being acceptable under today's standards.

Essentially, the court was merely observing that the shooting could have been avoided had defendant simply left the party when he saw the other people he claims were threats to him, but defendant chose not to do so. Given this context, the court's observation was merely how foolish and reckless defendant's behavior was when, if he really was fearful, he could have left the party and not engaged further with his supposed antagonists. The court's observation to this effect in no way imposed some burden on the defendant to retreat prior to acting in self-defense; instead, the court merely assessed the evidence to determine the veracity of defendant's testimony regarding his state of mind, as a court should do when evaluating a defendant's claim of self-defense.

¶ 80        Third, the trial court in its lengthy remarks made clear that (1) it did not believe defendant and (2) it did believe the eyewitnesses who said he shot the victims without any justification and without the victims' having guns or threatening him in any way. Immediately after saying that the court seriously questioned defendant's credibility, the court explained, "Even if I accepted the defendant's testimony as true, it still shows the situation that it escalated to the point to where a reasonable person would have extricated themselves from this party long before this confrontation ever took place." In so speaking, the court was talking about how it might have viewed this situation if it had "accepted the defendant's testimony as true;" however, the court had just explained that it did not accept that testimony as true.

¶ 81        Defendant claims that the trial court never made any credibility determination regarding defendant's testimony "because it believed it did not have to do so." We reject this interpretation of the trial court's remarks and deem it little better than Talmudic parsing of the court's language. In our view, the trial court made clear that it did not believe defendant and did believe the eyewitnesses who testified that defendant shot the victims at this party without being threatened in any way by the victims and without their presenting any weapons to him at all.

¶ 82    We earlier spoke of the lengthy explanation the trial court provided regarding how it viewed the evidence and why it reached the decisions it did. We commend the trial court for doing so and believe the criminal justice system is strengthened when courts in bench trials explain their reasoning.

¶ 83    The trial court in this case did a wonderful job of reviewing all of the evidence and testimony with which it was presented, and if this court were to, as defendant requests, take a few sentences uttered by the trial court out of context in this 38-page transcript explaining the court's decision, our doing so would have a seriously chilling effect on other trial courts as they consider whether they should provide a detailed explanation of their decisions. In fact, like at a jury trial, the law required nothing more from the trial court in this case, acting as trier of fact, than to simply say, "I find that the State has proved the defendant guilty beyond a reasonable doubt and has proved beyond a reasonable doubt he did not act in self-defense." If we were to accept defendant's arguments, we would be encouraging precisely that sort of minimal explanation.

¶ 84              B. The Trial Court Properly Conducted a *Krankel* Hearing

¶ 85    Defendant next argues that the trial court erred because he demonstrated during the court's *Krankel* inquiry that trial counsel possibly neglected his case. Thus, defendant contends, this case should be remanded for an attorney to be appointed to investigate and litigate his claims of ineffective assistance of counsel. We disagree.

¶ 86              1. Krankel *Hearings and the Standard of Review*

¶ 87    "A *pro se* posttrial motion alleging ineffective assistance of counsel is governed by the common-law procedure developed by [the Illinois Supreme Court] in [*People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)]." *People v. Roddis*, 2020 IL 124352, ¶ 34, 161 N.E.3d 173 177. When a defendant makes a *pro se* posttrial claim of ineffective assistance of counsel, "the

court should first examine the factual basis of the defendant's claim." *Id.* ¶ 35. "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel." *Id.* "However, if the allegations show possible neglect of the case, new counsel should be appointed." *Id.*

¶ 88 "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 78, 797 N.E.2d 631, 638 (2003). "During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Id.* "Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations." *Id.* "A brief discussion between the trial court and the defendant may be sufficient." *Id.* "Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.*

¶ 89 The issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*. *Roddis*, 2020 IL 124352, ¶ 33. When a trial court has properly conducted a *Krankel* hearing, a reviewing court will review the trial court's determination that a defendant's claim does not demonstrate a possible neglect of the case by asking if that decision is manifestly erroneous. *People v. Lawson*, 2019 IL App (4th) 180452, ¶ 43, 139 N.E.3d 663. A decision is manifestly erroneous "when the opposite conclusion is clearly evident." *Id.* (quoting *People v. Coleman*, 2013 IL 113307, ¶ 98, 996 N.E.2d 617).

¶ 90 2. *The* Krankel *Hearing in This Case*

¶ 91        In May 2021, prior to sentencing, defendant *pro se* filed a motion for new trial that raised issues of ineffective assistance of counsel. In July 2021, the trial court conducted a *Krankel* hearing at which defendant was allowed to orally expand on his claims of ineffective assistance of counsel to the court. We note that the court at that hearing carefully went through each of the ineffectiveness claims defendant raised and gave both defendant and his trial counsel an opportunity to speak about each.

¶ 92        After conducting the *Krankel* hearing, the trial court took the matter under advisement. Almost four weeks later, the court entered a written order in which it stated that it did not find merit in defendant's allegations so as to appoint counsel to investigate defendant's claims of ineffective assistance of counsel. We note that the court's order was thorough, comprehensive, and five single-spaced pages in length.

¶ 93        The trial court in its order first began by carefully—and correctly—discussing the law governing *Krankel* hearings. Citing *People v. Johnson*, 159 Ill. 2d 97, 126, 636 N.E.3d 485, 498 (1994), the court wrote that when a defendant's claim is conclusory, misleading, legally immaterial, or pertains solely to issues of trial strategy, new counsel generally will not be appointed. Citing other Illinois Supreme Court decisions, the trial court went on to explain what the supreme court meant by each of those terms.

¶ 94        The trial court then reviewed the specific claims made by defendant, such as that his trial counsel was ineffective for failing to impeach two eyewitnesses, Sims and Caldwell. Defendant asserted that their testimony was revenge testimony and that the motive for their false testimony was that Sims and Caldwell were friends with the victims. The court found this allegation was conclusory and noted that the court was aware of the information contained in defendant's claims before rendering its decision finding him guilty. The court also noted other

deficiencies in this claim.

¶ 95        Defendant also claimed that his trial counsel was ineffective for failing to call Scott Robinson as a witness. Robinson allegedly told the police the day after the shooting that he saw someone with a gun at the opposite end of the backyard from where defendant and the alleged victims were located. Defendant asserted this person could have fired the bullet that killed Alexander.

¶ 96        Defendant's trial counsel explained that he interviewed Robinson and found him to be not credible and a person who gave inconsistent stories. The trial court then explained in some detail why it found this claim to be groundless.

¶ 97        We need not address other claims made by defendant in which he alleged the ineffectiveness of his trial counsel because they have even less merit than the ones we have already discussed. Suffice it to say we conclude that the trial court properly conducted a *Krankel* hearing and the court's determination that defendant's claim did not demonstrate possible neglect in his case by his trial counsel was clearly not manifestly erroneous.

¶ 98                    III. CONCLUSION

¶ 99        For the reasons stated, we affirm the trial court's judgment.

¶ 100       Affirmed.